# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CA-01885-SCT

*F. JOSEPH "JERRY" REIN, SR. AND F. JOSEPH
"JOEY" REIN, JR., INDIVIDUALLY AND ON
BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES OF GATHA NELL REIN,
DECEASED*

*v.*

*BENCHMARK CONSTRUCTION COMPANY,
GROWIN GREEN LANDSCAPE, INC. AND
WILLIAM SCHILLING, INDIVIDUALLY AND d/b/a
NATURAL ACCENTS NURSERY AND
LANDSCAPERS*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 8/3/2001 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | SHANE F. LANGSTON |
| ATTORNEYS FOR APPELLEES: | JASON HOOD STRONG |
| | ROBERT S. ADDISON |
| | CECELIA DENISE CAMERON |
| | RICHARD T. LAWRENCE |
| | CRAIG ROBERT SESSUMS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 02/12/2004 |
| MOTION FOR REHEARING FILED: | 06/26/2003 |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The motion for rehearing is denied.  The previous opinion of this Court is withdrawn, and this

opinion is substituted therefor.

¶2. Gatha Nell Rein, an elderly Alzheimer's patient, was a resident of Silver Cross Nursing Home ("Silver Cross"). She died on September 3, 1998, as a result of being attacked and bitten in her bed by fire ants on August 30, 1998, at the Silver Cross facility. Her husband and son, F. Joseph "Jerry" Rein, Sr., and F. Joseph "Joey" Rein, Jr., sued Silver Cross, Ace Pest Control ("Ace"), Benchmark Construction Company ("Benchmark"), and two landscaping companies, Growin Green Landscape, Inc. (Growin Green) and William Schilling, individually and d/b/a Natural Accents Nursery and Landscapers ("Natural Accents") for damages for her wrongful death. The Reins settled with Silver Cross and Ace Pest Control. The Hinds County Circuit Court dismissed the negligence and breach of contract claims against Benchmark, Growin Green and Natural Accents. The Reins ask that this Court overturn the trial court's decisions.

**FACTS**

¶3. Mrs. Rein was attacked, bitten and gravely injured by fire ants while lying in her bed at Silver Cross. As a result, she died three days later. Apparently, the ants entered and infested her room by crawling through spaces in the walls. Immediately after the invasion and assault on Mrs. Rein, it was determined that the ants likely came from an ant bed immediately outside Mrs. Rein's room. The record indicates that this was not the first time fire ants invaded the nursing home as staff and patients previously saw fire ants in the facility. The record clearly indicates that the ants were strongly attracted to moisture which lingered around the exterior perimeter of the building. The reasons for that concentration of moisture are vigorously disputed. The length of time the ant bed was allowed to exist untreated and detected outside Mrs. Rein's room is also debated.

¶4. First, the Reins argue that the errors and omissions of Benchmark were the cause of Mrs. Rein's death. They contend that Benchmark breached its contract with Silver Cross to build a safe facility for the

benefit of Silver Cross as well as third-party beneficiaries including Mrs. Rein. They also contend that Benchmark's negligence in inadequate construction of Silver Cross was the proximate cause or a contributing cause of the attack on Mrs. Rein and her subsequent death.

¶5.     The Reins also allege breach of contract by Benchmark. They assert that Mrs. Rein was a third-party beneficiary of the construction contract between Benchmark and Silver Cross. They allege that Benchmark breached obligations owed to Silver Cross as well as the residents, who were the third-party beneficiaries of the contract, when it failed to construct the facility to allow adequate drainage.

¶6.     The Reins assert that Benchmark contracted to construct the nursing home in accordance with the agreed and applicable state and federal government and agency standards, plans and specifications. The Reins contend that the contract expressly or impliedly provided for Benchmark's construction of a safe facility for its elderly, disabled and confined residents. Benchmark's faulty construction and failure to follow specifications, an example of which was the inadequate site preparation, is blamed for the resulting continuous moisture outside of the building which was conducive to insect infestation. Benchmark is also blamed for not ensuring the safety of the fill dirt that was used in the construction. It is also suggested that Benchmark improperly failed to treat the building and site for fire ants.

¶7.     The Reins contend that Benchmark's negligence or gross negligence was the proximate cause, or alternatively, a contributing cause of Mrs. Rein's death. They assert that punitive damages are warranted since Benchmark's conduct was in conscious, wilful, wanting and reckless disregard for Mrs. Rein's rights. The Reins argue that Benchmark should have reasonably foreseen the importance of site preparation and drainage when constructing the facility.

¶8.     Several pertinent exhibits filed by the Reins in response to Benchmark's Motion to Dismiss were examined by the trial court and are included in the record. In support of their claims against Benchmark,

the Reins submitted reports from an entomologist, a foundation company, the Department of Health and Human Services and the affidavit of a public works contractor.

¶9.    The Reins presented the trial court with a letter from James Jarratt, an entomologist with the Mississippi State University Cooperative Extension Service. That letter indicates that Jarratt observed problems in the building perimeter which would tend to hamper pest control efforts. He referred to the position of the weep holes, the stucco like wall covering, and the drainage and direction of the irrigation heads. Upon inspection, Jarratt recognized that the weep holes were not the usual distance from the grade of the building but were instead "at grade" in some places and as much as six to eight inches below grade in others, which resulted in poor functioning. He also described pine mulch and top soil stacked against the building blocking the holes. He found the stucco finish of the building to be below grade which can act as a wick and move moisture up into the wall voids which, in turn, attracts insects. He mentioned that the downspouts were located behind air conditioning pads, also causing inadequate drainage by forcing water into the weep holes. Finally, Jarratt remarked that the irrigation system was not working. Having observed moisture in two places, he suspected that the walls were wet when the irrigation system was used. He concluded that the exclusive correction of the problems he observed would not be sufficient to control the insect infestations at Silver Cross. He recommended that additional procedures be implemented along with his suggestions.

¶10.    After Mrs. Rein's death, her family hired an engineering firm to examine the Silver Cross facility. Benchmark Engineering, a company separate and distinct from Benchmark Construction, examined the original plans and specifications for the construction of Silver Cross. A foundation report written by J.B. Rushing and based on his observations was presented to the trial court to support the allegations against Benchmark. Benchmark Engineering found violations of plans and specifications in construction. First, the

4

firm indicated that the landscaping and sidewalk were improperly constructed which caused undesirable, constant moisture above the brick ledge. The second violation that Rushing found was the improper construction of brick wall on the front porch which allowed the weep holes to carry moisture to the foundation which held moisture against the building causing the deterioration of the structure of the wall, the Gypsum board and insulation. Benchmark Engineering recommended the development and installation of plans to allow proper drainage.

¶11.    A Department of Health and Human Services report which detailed the previous violations by Silver Cross and the subsequent solutions was the third exhibit offered by the Reins. That report recites that the building contractor, Benchmark Construction, improperly failed to furnish the Department with an "as built" survey, resulting in Benchmark's violation of Department requirements. Based on its agent's initial inspection and staff interviews, the Department of Health and Human Services found that the facility was not "designed, constructed, equipped and maintained to protect the health and safety of the residents, personnel and public." The inspector observed improper establishment or maintenance of the contours and elevations of soil at Silver Cross. The soil in the flower beds was six inches above the slab. The inspector described substandard construction that prevented free run off from water and proper downspout discharge. The Department demanded that Silver Cross correct the inadequacies with substantial grading and trenching. That same document also recites the follow up measures taken by Silver Cross in response to those demands. The Department noted that Silver Cross hired an engineer and a survey company to conduct an "as built" survey and that there were explicit plans for corrective measures to bring the facility in line within the original plans and to divert moisture.

¶12.    Last, the Reins submitted the affidavit of Ben Turnage ("Turnage"), the CEO of Roxco, a public works contractor. Based on his personal knowledge and experience, Turnage characterized the

5

importance of adequate drainage as being commonly recognized in the general contracting profession. He asserted that it is general knowledge in the construction industry that inadequate construction which results in poor drainage can cause many foreseeable problems. One such common and regularly recognized result, as reported by Turnage, is insect infestation. With support from Turnage, the Reins argue that it is reasonable to expect a builder to know and appreciate the risks associated with improper construction allowing excessive moisture along exterior walls.

¶13.    Benchmark counters that the Reins have failed to state a claim. Benchmark first argues that there is  no allowable claim for breach of contract. Benchmark contends that Rein was not a third-party beneficiary to the contract as the only direct beneficiary was Silver Cross.   It is further countered that, at most, Silver Cross residents such as Mrs. Rein are an incidental beneficiaries. Further, Benchmark asserts compliance with applicable building codes, plans and specifications. Alternatively, Benchmark argues that it was not reasonably foreseeable that ants would invade the facility, climb into Mrs.  Rein's bed, injuring her and ultimately causing her death,  two years after completion of the building. Benchmark argues that a  burden to foresee the unforeseeable is not properly imposed. The building contractor asserts Turnage and Jarratt based their  statements on hindsight  and information unavailable at the time of Benchmark's involvement.  Further, Benchmark asserts its  construction was not the proximate  or a contributing cause of Mrs. Rein's death.  Benchmark asserts that even if the ants were drawn to moisture along the building's perimeter, this result was unusual, improbable, and extraordinary.

¶14.    Also sued by the Reins is Growin Green, a landscape contractor hired by Silver Cross for the initial landscaping and its maintenance. Growin Green was under contract with Silver Cross  until July 1998, one month prior to Mrs. Rein's death. The original contract  was for Growin Green to  plant grass, construct a  sprinkler system and perform related landscape work at Silver Cross.  After the original landscaping was

6

complete, the parties entered an agreement for a maintenance contract. The contract as found in the record does not refer to any responsibility by Growin Green to treat, inspect and control fire ants inside or outside the building. The record indicates that there were occasions when Growin Green took steps to eliminate ant mounds from the areas for which it had landscaping responsibilities.

¶15. The Reins contend that the maintenance contract between Silver Cross and Growin Green included an obligation for Growin Green to use reasonable and appropriate methods to inspect, treat and control insects on the outside of the building along with an obligation to provide advice on fire ant control and proper irrigation. They allege that Growin Green's failure to perform these obligations was a significant or contributing cause of Mrs. Rein's death. Alternatively, the Reins urge that, even if the contract did not include an obligation to spray for pests, Growin Green voluntarily assumed the duty to control fire ants in a reasonable manner even though the company did not have adequate experience and knowledge. The deposition of Gussie Ashley, the administrator at Silver Cross, is advanced to show Silver Cross' reliance on Growin Green to eradicate the ant problem. The Reins argue that since all the pest control experts agree that effective fire ant control begins with the exterior of the building, there exists a fact issue as to the identity of the company responsible for such control. As with Benchmark, the Reins assert that punitive damages are proper since Growin Green's omissions, conduct, breaches and failures were grossly negligent and in reckless disregard for the rights and safety of Mrs. Rein.

¶16. Growin Green claims its had no duty to protect Mrs. Rein from ants attacking and killing her in her bed. Instead, Growin Green's commitment was only to maintain the lawn and shrubbery. Growin Green submits there is no evidence of any authority for it to perform any services inside Silver Cross. Growin Green notes that during the bidding process the parties did not discuss controlling, inspecting or treatment for fire ants nor was any such language included in either contract with Silver Cross. Above all, even if

7

a duty formerly existed, Growin Green ceased to provide services one month before Mrs. Rein's death. Common sense dictates that an ant bed could have formed within 24 hours of the attack and certainly within the month after Growin Green's contract ended.

¶17.   Growin Green insists that efforts to eradicate ants were made for the sole purpose of protecting its lawnmowers and equipment. Jamie Gatlin, the owner of Growin Green, explained by affidavit that monthly responsibilities were "limited to maintaining the landscape only" and ant control was for equipment protection only with no charge to treat fire ant mounds or for the chemicals used in treating those mounds. Growin Green contends that the Reins' own expert entomologist lends support in stating that "it is common for lawn maintenance companies to poison mounds to protect their equipment." William King, the Reins' second expert entomologist, agreed that "it is reasonable for a landscape company to poison ant mounds to eliminate risk to their equipment." King also stated that "no matter what the yard man does or the maintenance man does, they [the pest control company] are responsible for the treatment and care of that facility." Further the facility administrator acknowledged the occasional treatments "out in the yard." She did not indicate that there were any expectations for Growing Green to perform duties relating to insect control or eradication.

¶18.   Growin Green further argues that even if it voluntarily assumed the duty to treat and control fire ants, summary judgment was still proper because any liability imposed must be limited to the extent of the undertaking. Growin Green cites several cases from other jurisdictions that state this theory. *Bailey v. Edward Hines Lumber, Co.*, 719 N.E.2d 178 (Ill. App. Ct. 1999) (the duty of care imposed on a defendant is limited to the extent of the undertaking); *Coyle v. Englander's*, 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985) (liability is limited to harms resulting from the risk that the undertaking was intended or reasonably expected to protect); *Morin v. Traveler's Rest Motel, Inc.*, 704 A.2d 1085

8

(Pa. Super. Ct. 1997) (salting one portion of the parking lot is not an undertaking to salt it all). Growin Green warns that "if the plaintiff's argument were the law, yard men and landscape businesses could not put insecticide on lawns or plants for fear that they might be sued if insects did damage to someone or something inside the building." Growin Green argues that the allegations go beyond the scope of the duty actually undertaken which was to provide lawn and landscape services. Growin Green also contends that any duty to control fire ants was terminated the month before the attack on Mrs. Rein when the contract was terminated. Growin Green suggests this theory would impose liability beyond its undertaking.

¶19.    Growin Green contends that it was unforeseeable that ants would enter the Silver Cross facility, crawl into Mrs. Rein's bed and attack her. Growin Green argues that to impose liability would place the burden of anticipating of an unusual, improbable and extraordinary occurrence. Growin Green advances that although damage to their equipment or the plants from improper application of insecticide is foreseeable, it was unforeseeable that ants would kill Mrs. Rein in her bed.

¶20.    It further argues that damages should be limited by Miss. Code Ann. § 85-5-7 (1999) as the negligence of others was the cause of Mrs. Rein's death. Growin Green advances that Silver Cross was not induced to forego other pest control methods in order to control pests inside the building. It points to the relationship between Silver Cross and Ace Pest Control which obligated Ace to treat and inspect the inside and outside of the facility. It also refers to the duty of Silver Cross employees to inspect and treat the facility for ants.

¶21.    Finally, Growin Green claims that it had no reason to know that residents were dependent on its inspections or that it was necessary for their protection. Growin Green argues that as a result, any benefits accruing to the residents were purely incidental. In conclusion, Growin Green asserts that third-party rights were never vested in Mrs. Rein since she was not a beneficiary within the intent, terms, and meaning of the

9

contract. Growin Green contends that the residents' only beneficial interest in the contract was the enjoyment of a landscaped facility.

¶22. The Reins contend that Natural Accents negligently failed to treat the grounds and/or to properly advise Silver Cross on treatment or eradication of fire ants. They also cite Natural Accents' failure to control the irrigation surrounding the facility and advise Silver Cross on possible irrigation problems. They state that the negligent or grossly negligent failure by Natural Accents to perform the contracted duties contributed to or proximately caused Mrs. Rein's injuries and subsequent death. The Reins argue that Natural Accents contracted with Silver Cross to control ants around the outside perimeter of the Silver Cross building. The Reins contend that the residents, including Mrs. Rein, were intended to be third-party beneficiaries of that contract and that Natural Accents negligently breached a duty owed to Silver Cross and its residents. In support, the Reins submitted the proposal from Natural Accents given to Silver Cross which details the services to be rendered by Natural Accents. The proposal which became the contract contains express language indicating that Natural Accents' would perform "ant bed control."

¶23. Natural Accents contends that Mrs. Rein's injuries and death were a result of the negligence of other individuals or entities. It asserts that as a landscaping company, it did not have any obligation to control ants. Natural Accents refers to this service as a "courtesy," not a paid service obligating them to fire ant control. Further, Natural Accents submits that it was not foreseeable that fire ants would attack Mrs. Rein and cause her death. Finally, Natural Accents advances that there is no viable breach of contract claim because the work performed by directly benefitted Silver Cross, not residents such as Mrs. Rein.

## ANALYSIS

10

¶24. The trial court dismissed the complaints against Growin Green and Natural Accents pursuant to Rule 56 of the Mississippi Rules of Civil Procedure. The trial court also dismissed Benchmark, the builder of the nursing home. However, it improperly labeled its decision as falling under M.R.C.P. 12(b)(6) indicating that the Reins failed to state a *claim* against Benchmark. On motion to dismiss under Rule 12(b)(6) of the Mississippi Rules of Civil Procedure, the well-pleaded factual allegations of the complaint are taken as true, and the motion is not granted unless it appears beyond any reasonable doubt that the non movant can prove no set of facts in support of the claim which would entitle them to relief. *Moore ex rel. City of Aberdeen v. Byars*, 757 So. 2d 243, 246 ( Miss. 2000); *Butler v. Bd. of Supervisors for Hinds County*, 659 So. 2d 578, 581 (Miss. 1995). On the other hand, when looking at the grant or denial of summary judgment, this Court, as well as the trial court, considers *all* evidentiary matters before it--admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. *Cook v. Children's Med. Group, P.A.*, 756 So. 2d 734, 739 (Miss. 1999); *Bennett v. Madakasira*, 821 So. 2d. 794, 797 (Miss. 2002); *Cole ex rel. Cole v. Buckner*, 819 So. 2d 527, 530 (Miss. 2002). Because the court made its decision after reviewing the Reins' complaint, Benchmark's answer and motion to dismiss along with the response to the motion to dismiss and the accompanying exhibits, its decision is properly labeled a summary judgment pursuant to Rule 56 of the Mississippi Rules of Civil Procedure.

¶25. Summary judgment is affirmed if the evidence, viewed in the light most favorable to the party against whom the motion is made, shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *City of Starkville v. 4-County Elec. Power Ass'n*, 819 So. 2d 1216, 1220 (Miss. 2002). Issues of fact are present when one party swears to one version of the matter and another says the opposite. *Cook*, 756 So. 2d at 739. Where there is the slightest doubt over whether a

11

factual issue exists, the court should resolve in favor of the non-moving party. ***Cothern v. Vickers, Inc.***, 759 So. 2d 1241, 1245 (Miss. 2000).

¶26.     The trial court granted summary judgment in favor of Benchmark. Based on the complaint and exhibits submitted by the Reins in response to the Motion to Dismiss and applicable Mississippi law, the trial court found that Benchmark could have no fault or liability based on the theory of negligence. The trial court found, as a matter of law, that it was not foreseeable to Benchmark that Mrs. Rein would be attacked and killed by fire ants some two years after the construction of Silver Cross. Further, the trial court found that, as a matter of law, failures in the construction of the nursing home could not have been the proximate cause of Mrs. Rein's death. As a matter of law, the trial court concluded that Mrs. Rein was not a third-party beneficiary of the construction contract.

¶27.     The trial court also granted Growin Green's motion for summary judgment. The trial court found that Growin Green did not assume nor owe a duty to Rein regarding fire ant control. The trial court noted that Growin Green is a landscape company, not a pest control company. The trial court found that Growin Green had no "broad sweeping duty" to control fire ants per the landscaping contract with Silver Cross. Additionally, because Growin Green was not employed by Silver Cross when the infestation occurred, Growin Green owed no duty to Mrs. Rein. Next, the trial court held that even if Growin Green had a duty, the fire ant attack on Mrs. Rein was unusual and unlikely, only remotely and slightly probable and consequently unforeseeable. The trial court concluded that Mrs. Rein and her representatives were not third-party beneficiaries to the contract between Growin Green and Silver Cross. The direct beneficiaries of the services provided by Growin Green within the contract with Silver Cross was that entity, not the residents such as Mrs. Rein.

¶28.    Finally, the trial court found that Natural Accents did not assume or otherwise owe a duty to Mrs. Rein to protect her from fire ants.  Further, even if Natural Accents had any duty, the trial court found that the fire ant attack on Mrs. Rein was unforeseeable.  The court also concluded that Mrs. Rein was not a third-party beneficiary of the contract between Natural Accents and Silver Cross.

¶29.    In analyzing an actor's alleged negligence, this Court asks whether a duty exists and whether it has been breached.  That is a question of law.  But, "[t]he important component of the **existence of the duty** is that the injury is '**reasonably foreseeable,**' "and thus it is appropriate for the trial judge to decide. *Lyle v. Mladinich,* 584 So. 2d 397, 399 (Miss. 1991) (emphasis added).  The ultimate question is whether Benchmark could reasonably foresee that failure to adequately provide for drainage around the building could likely lead to an insect infestation that would cause a death by fire ant bites to a resident of the nursing home.

¶30.    This Court in discussing the issues of duty and foreseeability has stated:

> To succeed on a claim for negligence, the plaintiff must prove duty, breach, causation and injury. *Meena v. Wilburn,* 603 So. 2d 866, 869 (Miss. 1992). The plaintiff must show "(1) the existence of a duty 'to conform to a specific standard of conduct for the protection of others against the unreasonable risk of injury', (2) a breach of that duty, (3) causal relationship between the breach and alleged injury, and (4) injury or damages." *Id*. at 870 n. 5 (*citing and quoting Burnham v. Tabb,* 508 So. 2d 1072, 1074 (Miss. 1987)). Duty and breach of duty are essential to finding negligence and must be demonstrated first. *Strantz v. Pinion,* 652 So. 2d 738, 742 (Miss. 1995).
>
> While **duty and causation both involve foreseeability**, duty is an issue of **law**, and causation is **generally** a matter for the jury. Juries are not instructed in, nor do they engage in, consideration of the policy matters and the precedent which define the concept of duty. W. Page Keeton, *Prosser and Keeton on Torts* §§ 37, at 236 (5th ed.1984). This Court has held that the existence vel non of a duty of care is a question of **law** to be decided by the Court. *Foster v. Bass,* 575 So. 2d 967, 972-73 (Miss. 1990).

*Donald v. Amoco Prod. Co.*, 735 So. 2d 161, 174 (Miss. 1999) (emphasis added).

13

¶31.    The Court of Appeals considered the issue of foreseeability in *Hankins Lumber Co. v. Moore*, 774 So. 2d 459, 464 (Miss. Ct. App. 2000).  In *Hankins*, the Court of Appeals stated:

> **When reasonable minds might differ on the matter**, questions of proximate cause and of negligence and of contributory negligence are *generally* for determination of jury. *American Creosote Works of Louisiana v. Harp*, 215 Miss. 5, 12, 60 So. 2d 514, 517 (1952). These questions are for the jury to decide under proper instructions of the court as to the applicable principles of law involved. *Smith v. Walton*, 271 So. 2d 409, 413 (Miss. 1973). **Foreseeability** and breach of duty are also issues to be decided by the finder of fact **once sufficient evidence is presented in a negligence case**. *American Nat. Ins. Co. v. Hogue*, 749 So. 2d 1254, 1259 (Miss. Ct. App. 2000).

*Hankins*, 774 So. 2d at 464 (emphasis added). Thus, it is a jury question only if there is "sufficient evidence" before the Court; and therefore, the ruling by the trial court was a judgment call as a matter of law, but certainly not impermissible.

¶32.    Under Mississippi law, for a person to be liable for another person's injury, the cause of an injury must be of such a character and done in such a situation that the actor should have reasonably anticipated some injury as a probable result.  *Mauney v. Gulf Ref. Co.*, 193 Miss. 421, 9 So. 2d 780, 781 (1942). The actor is not bound to a precision of anticipation which would include an unusual and improbable or extraordinary occurrence, although such happening is within the range of possibilities. *Id.*  This Court requires that:

> [t]he principles of common law must be kept within practical bounds and so as not to occupy an attitude which would place it over and above the heads of those who must carry on the every day affairs of life.  Hence, the law must say, as it does, that "care or foresight as to the probable effect of an act is not to be weighed on jewelers scales, nor calculated by the expert mind of the philosopher, from cause to effect, in all situations."

*Id.* (citing *Illinois Cent. R. Co. v. Bloodworth*, 166 Miss. 602, 145 So. 333 (1933)).

14

¶33.    In **Sturdivant v. Crosby Lumber & Mfg. Co.**, 218 Miss. 91, 65 So. 2d 291 (1953), Sturdivant was on his employer's business premises eating lunch under a tree when lightning struck a power line nearby. The lightning left the line and arced thirty feet away into a creek and over to the tree under which Sturdivant was sitting and ran down a vine into Sturdivant's body. **Id.** at 292-93. This Court opined that:

> [t]o impose upon appellee liability for Sturdivant's death would be placing upon appellee the burden of prevision or anticipation of an unusual, improbable or extraordinary occurrence. It was within the range of possibilities that lightning would strike the power line, that it would not follow the line into the pump house and the planer mill, but that it would continue straight ahead, leave the line, arc thirty feet over the creek into a tree, that Sturdivant would be under the tree, and that the lightning would then go through the tree and down a vine into Sturdivant's body. But although there was a possibility, those events were most assuredly no more than that.

**Id.** at 101-02. The Court found that the event was too remote to require the defendant to foresee and guard against it. **Id.**

¶34.    When the conduct of the actor is a substantial factor in bringing about harm to another then, "the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable." Restatement (Second) of Torts, § 435 (1965). This Court has expressly rejected the argument that there is no negligence because the injury rarely occurs, or never before occurred. **Gulf Ref. Co. v. Williams**, 183 Miss. 723, 185 So. 234, 235 (1936) (citing **Crawford v. City of Meridian**, 174 Miss. 875, 165 So. 612 (1936)). In regard to foreseeability, the "inquiry is not whether the thing is to be foreseen or anticipated as one which will probably happen, but whether it is likely to happen, even though the likelihood may not be sufficient to amount to a comparative probability." **Williams**, 185 So. at 236. Further this Court has held that defendants "cannot escape liability because a particular injury could not be foreseen, if *some* injury ought to have been reasonably

15

anticipated." ***Delta Elec. Power Ass'n v. Burton***, 240 Miss. 209, 126 So. 2d 258, 261 (1961) (emphasis added).

¶35. In ***McCulloch v. Glasgow***, the plaintiff alleged that his heart attack was the result of the City of Ackerman taking his property through eminent domain. ***McCulloch v. Glasgow***, 620 F.2d 47, 52 (5th Cir. 1980). The City called his heart attack unforeseeable. ***Id.*** The Fifth Circuit stated that the heart attack need not have been foreseeable if the defendant should have foreseen that its action would expose the plaintiff to risk of some otherwise compensable injury. ***Id.***

¶36. This Court has explained the theory of assumption of liability. ***Hartford Steam Boiler Inspection & Ins. Co. v. Cooper***, 341 So. 2d 665 (Miss. 1977). In ***Hartford***, the operator of a chicken processing plant was insured by Hartford for the cost of repairs and equipment and losses for breakdown of machinery. ***Id.*** Under the policy terms, Hartford had a right, but was not required to inspect the equipment and suspend coverage under certain circumstances. ***Id.*** While Hartford inspections were made only when a machine was torn down for repairs, Sanderson employed a maintenance superintendent and mechanics to maintain the equipment. ***Id.*** An employee suffered an injury and alleged that Hartford should have recognized that inspection was necessary for the protection of third persons. ***Id.*** The insurance policy provision giving Hartford the right to make inspections was for the purpose of "reducing risk of loss that Hartford might have under the policy." ***Id.*** It did not "rationally give rise to liability for failure to inspect a particular piece of equipment" to the insured's employees. ***Id.*** The benefit was held to be incidental. ***Id.*** The Court found that Hartford had no reason to know that Sanderson's employees were dependent on the inspections or that they were necessary for their protection. ***Id.*** There

16

was no basis for finding that Sanderson was induced by the undertaking to "forego taking precautions against harm to its employees." *Id.* at 668.

¶37. Finally, under Mississippi law, a third party may maintain an action as a third-party beneficiary to enforce a promise made for their benefit. *Burns v. Washington Savs.*, 251 Miss. 789, 171 So. 2d 322, 324 (1965). However, this right must "spring" from the terms of the contract. *Trammell v. State*, 622 So. 2d 1257, 1260 (Miss. 1993); *Miss. High Sch. Activities Ass'n, Inc. v. Farris*, 501 So. 2d 393, 396 (Miss. 1987). Further, a third-party beneficiary may sue for a contract breach only when the alleged broken condition was placed in the contract for their direct benefit. *Id.* However, an incidental beneficiary requires by virtue of a contract no right against the promisor or promisee. *Id.* (citing *Hartford Acc. & Indem. Co. v. Hewes*, 190 Miss. 225, 199 So. 93 (1940)).

¶38. In *Farris*, a high school basketball team was placed on probation and prevented from competing in a tournament. *Farris*, 501 So. 2d at 393. Team members brought suit against the MHSAA which asked for an injunction to prevent the MHSAA from placing the team on probation. *Id.* The members alleged that a contract existed that prevented the MHSAA from levying sanctions against the school and team without notice. *Id.* The team members reasoned that they were third-party beneficiaries and were entitled to sue for breach of the terms. *Id.* This Court found that the notice provision directly benefitted the school and that while the student received benefits, such benefits were more incidental than direct. *Id.* at 396. In *Hanberry Corp. v. State Bldg. Comm'n,* 390 So. 2d 277, 279 ( Miss. 1980), this Court outlined the elements of a successful third-party beneficiary claim:

> In order for the third person beneficiary to have a cause of action, the contracts between the original parties must have been entered into for his benefit, or at least such benefit must be the direct result of the performance within the contemplation of the parties as shown by its terms. There must have been a legal obligation or duty on the part of the promisee to

17

such third person beneficiary. This obligation must have a legal duty which connects the beneficiary with the contract. In other words, the right (of action) of the third party beneficiary to maintain an action on the contract must spring from the terms of the contract itself.

*Id.* at 279. No right against the contract promisor or promisee is acquired by a "mere incidental beneficiary." *Trammell v. State*, 622 So. 2d at 1260.

¶39.    As to the claims against Benchmark Construction Company, we must ask whether Benchmark had a duty and breached it. That is a question of law. As stated earlier, "[t]he important component of the **existence of the duty** is that the injury is '**reasonably foreseeable,**'"and thus it is appropriate for the trial judge to decide. *Lyle*, 584 So. 2d at 399. The ultimate question is whether Benchmark could reasonably foresee that failure to adequately provide for drainage around the building could likely lead to an insect infestation that would cause a death by fire ant bites to a resident of the nursing home.

¶40.    Based on the facts, we hold that the trial court was correct to its decision to dismiss Benchmark by summary judgment, pursuant to M.RC.P. 56. We base our decision on the foreseeability test of the elements of negligence. Benchmark may have reasonably foreseen an insect infestation as a result of improper construction techniques and poor planning of the drainage system. However, Benchmark could not reasonably foreseen that Mrs. Rein would be attacked and killed by fire ants two years after construction of the Silver Cross Nursing Home. The terrible tragedy that occurred at Silver Cross was an unusual, improbable, and extraordinary occurrence. We hold that, as in *Sturdivant*, the event here was too remote to require Benchmark to foresee. Mrs. Rein's death due to fire ant bites was a mere possibility, and no more. Summary judgment was also proper on the contract claim against Benchmark because Mrs. Rein was not a third-party beneficiary of the construction contract between Benchmark and Silver Cross.

18

¶41.    Next, we hold that the trial court correctly granted summary judgment in favor of Growin Green. Growin Green did not assume nor owe a duty to provide fire ant detection, control or eradication in a reasonable manner or any manner. Growin Green had a commitment only to maintain the lawn and shrubbery. Growin Green is a landscape company, not a pest control company. The contract between Growin Green and Silver Cross does not specify duties to treat for insect infestation outside the facility much less inside. In fact, there is no indication of any grant of authority for Growin Green to perform any services inside the Silver Cross facility at all. Additionally, Silver Cross was not induced to forego other methods of pest control in reliance on any assumed duty by Growin Green. In fact, Silver Cross properly relied on its contract with Ace Pest Control to inspect and treat both the inside and outside of the facility. The Reins' experts admitted that it is common for a landscape company to treat ant beds to protect its equipment. Alternatively, as Growin Green asserts, even if there was a duty to treat and control fire ants which was voluntarily assumed by Growin Green, the liability is limited to the extent of the undertaking. The fact that Growin Green was not even employed at the time of Mrs. Rein's death supports our decision as Growin Green owed no duty of care whatsoever to Silver Cross nor to Mrs. Rein when the incident occurred. The liability imposed on Growin Green must be limited to that which they allegedly assumed. That voluntary assumption would have terminated when the contract with Growin Green terminated, one month before the attack on Mrs. Rein. The Reins' own experts recognized and common sense dictates, that ant beds could have formed within the weeks or even the day before the attack, which was relatively long after Growin Green's obligations ended. Further, Mrs. Rein was not a third-party beneficiary to the contract between Silver Cross and Growin Green. The direct beneficiary of the contract was Silver Cross. There was no relationship between Growin Green and Mrs. Rein created by the contract between Silver Cross and Growin Green. The terms of the contract between Silver Cross and Growin Green were not

19

broad enough to include Mrs. Rein or any other resident of Silver Cross. Alternatively, if the residents obtained incidental benefits from the contract, these were aesthetic benefits and not protection of their health and safety.

¶42.　Finally, we hold that the trial court erred in granting Natural Accent's Motion for Summary Judgment. The trial court incorrectly dismissed Natural Accents because issues of material facts remain as to negligence by Natural Accents. The evidence that we find to be most compelling in our decision is the proposal from Natural Accents to Silver Cross. That proposal indicates that Natural Accents did indeed contract to provide "ant bed control." That evidence shows, as a matter of law, that Natural Accents obligated itself, by its own express terms, to some duty to inspect and treat ant beds at Silver Cross. The scope of that duty is a proper question for the trier of fact. The foreseeability of Mrs. Rein's injuries and death to Natural Accents is also a jury question. Further, the same trier of fact should determine the significance as related to causation of the failure by Natural Accents to comply with the terms of the contract. We find it pertinent that a fire ant bed was found *outside* the building immediately adjacent to Mrs. Rein's room after her death. The trial court's grant of summary judgment in favor of Natural Accents is reversed and remanded.

## CONCLUSION

¶43.　Based on the lack of foreseeability and Mrs. Rein's lack of third-party beneficiary status, we hold that the trial court was correct in granting summary judgment in favor of Benchmark. That Mrs. Rein or any other resident would be attacked and killed by fire ants two years after Benchmark's construction of the Silver Cross Nursing Home is not in any way a foreseeable result of improper construction. As stated earlier, the insect infestation is foreseeable, but this extraordinary event was not. Further, Mrs. Rein was not a third-party beneficiary of the construction contract between Silver Cross and Benchmark.

20

¶44. We also hold that the trial court correctly granted summary judgment to Growin Green since as a landscape company only, it did not assume nor owe a duty to provide fire ant detection, control or eradication. Likewise, Mrs. Rein was not a third-party beneficiary of the landscape contract between Silver Cross and Growin Green.

¶45. We find that the trial court erred in dismissing Natural Accents since issues of material facts remain. Its contract with Silver Cross indicates express obligations of some duty to inspect and treat ant beds at Silver Cross. The scope of Natural Accents' duty, the foreseeability of this event and Mrs. Rein's death, and whether a breach of Natural Accents' duty was the cause of this tragedy are proper questions for the trier of fact.

¶46. For these reasons, we affirm the trial court's judgment to the extent that it granted summary judgment for Benchmark Construction Company and Growin Green Landscape, Inc. We reverse the trial court's judgment to the extent that it granted summary judgment for Natural Accents, and we remand this case for a trial consistent with this opinion of the Reins' claims against Natural Accents.

¶47. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**PITTMAN, C.J., COBB, EASLEY, CARLSON AND DICKINSON, JJ., CONCUR. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WALLER, P.J., AND DIAZ, J., NOT PARTICIPATING.**