938 So.2d 879 (2006)
Frances WAGNER and Morris Wagner, Appellants
v.
The MATTIACE COMPANY, Appellee.
No. 2005-CA-01634-COA.
Court of Appeals of Mississippi.
September 12, 2006.
*880 Christopher Ethan Kittell, Clarksdale, attorney for appellants.
Michael D. Simmons, Jackson, attorney for appellee.
Before LEE, P.J., CHANDLER and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This "slip and fall" case is appealed from the Circuit Court of Panola County. While browsing at a catalog return store, aptly named Returns, Frances Wagner, stepped backward to get a better view a certain piece of furniture and tripped, striking her head on the floor below and causing severe injury. Wagner subsequently brought suit against the store owner and sublessee, Mike Lukacs (Lukacs), the lessee, Food Giant Supermarkets, Inc. (Food Giant), and the Mattiace Company (Mattiace), the property manager of the shopping center in which Returns was located. After Wagner's claims against Lukacs and Food Giant had settled and been dismissed, Mattiace filed its motion for summary judgment. After hearing arguments concerning the motion from both parties, the Circuit Court of Panola County granted Mattiace's motion and dismissed Wagner's claims. This appeal followed. Finding no error, we affirm.

FACTS
¶ 2. Returns was part of a shopping center in Senatobia, coincidentally named Senatobia Plaza Shopping Center (the Plaza). Through a series of subleases and amendments to the original lease (Lease), dated November 12, 1975, the store space in question was leased to Food Giant on March 20,1995. After operating a grocery store out of the space for an undermined amount of time, Food Giant subleased *881 (Sublease) the space, subject to all applicable terms and conditions contained in the Lease[1], to Lukacs for a term to run from August 1, 2000, to September 29, 2002.
¶ 3. In this case, as in most things, the devil is in the details. With that in mind, it is important to review applicable sections of the Lease and Sublease. Paragraph seventeen of the Lease stated as follows,
[T]he Lessor reserves the right during the term of this lease, to enter said premises at reasonable hours to show the same to other persons who may be interested in renting or buying the property, and for the purpose of inspecting the premises and to make such repairs as Lessor may deem necessary for the protection and preservation of the said building and premises; but Lessor is not bound to make any repairs whatsoever, nor to be held liable for any damage in consequence of leaks, or for defects about the building and premises, the Lessee having examined the same and being satisfied therewith; but should such leaks, obstructions, freezing, stoppages, or other defects about the building and premises occur during the term of this lease, or while the Lessee is occupying the premises, then the Lessee shall remedy the same promptly at the Lessee's expense unless the Lessor by written agreement undertakes to do the same (except as provided in Paragraph 38 hereof).
Paragraph thirty-eight of the lease, entitled "Repair," stated as follows,
[T]he Lessor is to make necessary repairs to roof, roof structure, exterior walls and foundations, after notice from Lessee of the need for such repairs. . . . It is further agreed and understood that all other repairs including, but not limited to exterior doors to the property herein leased are to be made by the Lessee, and all labor and material used by it in making any repairs or permitted alterations will be paid for promptly by Lessee. . . .
The Sublease, under paragraph four entitled "Assumption Agreement and Covenants" stated as follows, "Lukacs hereby assumes and shall faithfully and promptly make all payments and perform all obligations and duties imposed on Food Giant as `Lessee' under the Lease, including without limitation, any obligations to maintain and repair the Leased Premises. . . ." Furthermore, the Sublease stated that Lukacs inspected the premises and accepted it "AS IS."
¶ 4. Mattiace was in the business of managing property and in furtherance of this business entered into a management agreement (Agreement) on April 1, 1999, with the owner of the Plaza to manage three properties (collectively referred to as the "Property"), one of which being the Plaza. As part of its duties, Mattiace was generally responsible for leasing the various spaces located within the Property, preparing monthly and yearly budgets, collecting rent when due, and keeping the Property in a general state of repair. Specifically, the Agreement stated that "[t]he Manager shall. . . . hire, pay, supervise and discharge engineers, janitors and other personnel required to maintain and operate the Property."
¶ 5. Mark McCormack was employed by Mattiace as the property manager for the Plaza. He stated in an affidavit that Mattiace was not responsible for making repairs to, or maintaining the interior of, *882 Returns or for providing janitorial services for Returns. However, prior to Lukacs occupying the space, but while the space was still demised under the Lease, Mattiace did replace missing and broken tiles inside the space, swept and mopped the floors of the space, and made some plumbing repairs. McCormack stated this was done strictly to facilitate Lukacs's occupancy. Also, there was testimony that McCormack routinely inspected the Plaza, to include the inside and outside of the Returns space, and conducted one such inspection during the interval between the time Food Giant vacated the space and the time Lukacs opened Returns.
¶ 6. On September 12, 2002, Wagner was shopping at Returns and found a piece of furniture that caught her eye. Backing up to gain a better view of the item, she tripped and fell backwards to the floor, striking her head as she landed. Wagner alleges that the cause of her fall was a ridge on the ground that consisted of a buildup of wax, soil, and grease that was formed between the shelving units employed by Food Giant during their use of the space. Twenty of these ridges were scattered throughout Returns, and each ridge was approximately eight feet long, two inches wide, and one-quarter of an inch thick.
¶ 7. Frances and Morris Wagner brought suit, the latter under a loss of consortium claim, on December 31, 2002. In her complaint, Wagner set forth claims of negligence against Mattiace, Food Giant, and the Lukacs, d/b/a/ Returns. After Wagner settled with both Food Giant and the Lukacs, the Circuit Court of Panola County entered a final judgment on October 19, 2004, dismissing both aforementioned parties with prejudice. Several months later, on March 14, 2005, Mattiace filed its motion for summary judgment and alleged that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. Obviously in agreement with Mattiace, the Circuit Court of Panola County entered an order granting summary judgment for Mattiace on June 30, 2005. Wagner filed a motion to alter or amend the judgment on July 11, 2005, which was denied. Wagner then filed her notice of appeal on August 11, 2005.
¶ 8. On appeal, Wagner contends that the lower court erred in, (1) "holding that a negligent party may avoid liability for its negligent acts by later repudiating the duty which it had already breached," (2) "finding that [Mattiace], after assuming a duty to make repairs to a building's floor and after breaching its duty by negligently repairing the floor, can absolve itself of future responsibility for its previous negligent repair by abdicating its assumed duty," and (3) "finding that Mattiace's duty to maintain the property only applied to the outside of the property" when the Agreement did not explicitly contain such a limitation.

STANDARD OF REVIEW
¶ 9. Our review of summary judgments is de novo. Lyons v. Biloxi H.M.A., Inc., 925 So.2d 151(¶13) (Miss.Ct.App.2006). A motion for summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The movant carries the burden of showing that no genuine issue of material facts exists. Cothern v. Vickers, Inc., 759 So.2d 1241(¶ 6) (Miss.2000). Once the movant has met his burden, the nonmovant must show by affirmative evidence that a genuine issue of material fact does, indeed, exist. Id. The evidence must *883 be viewed in a light most favorable to the non-movant. McMillan v. Rodriguez, 823 So.2d 1173(¶ 9) (Miss.2002). Furthermore, "the non-movant should be given the benefit of every reasonable doubt." Cothern, 759 So.2d at (¶ 6).

ISSUES AND ANALYSIS
I. WHETHER MATTIACE HAD A CONTRACTUAL DUTY TO REMOVE THE SUBSTANCE THAT ALLEGEDLY CAUSED WAGNER TO FALL.
¶ 10. Wagner's first point of error is that the lower court erred in finding that Mattiace had no contractual duty to maintain the interior of the space where Returns was located. The lower court opined that the language of the Agreement specifying that Mattiace was to "hire, pay, supervise and discharge engineers, janitors and other personnel required to maintain and operate the Property" notwithstanding, the Lease between the owner and Food Giant in combination with the Sublease between Food Giant and Lukacs showed that Mattiace had no contractual duty to maintain the interior of Returns. We agree.
¶ 11. In order to succeed in a negligence action, the plaintiff must prove, through sufficient evidence, the conventional tort elements of duty, breach of said duty, proximate causation, and injury. McFarland v. Leake, 864 So.2d 959(¶ 7) (Miss.Ct.App.2003). Therefore, to rebut the movant's claim of a lack of any genuine issue of material fact, the nonmovant must bring forth supportive evidence of significant and probative value which shows the movant breached an established duty, and that the breach was the proximate cause of the non-movant's injury. Id. Whether a duty exists is a question of law. Brown v. J.J. Ferguson Sand & Gravel Co., 858 So.2d 129(¶ 9) (Miss.2003).
¶ 12. The Agreement stipulated that Mattiace was to hire and supervise those individuals needed to "maintain and operate the Property." This document alone may indicate that Mattiace had a duty to not only maintain the exterior of the Plaza, but also the interior of the individual spaces within the Plaza, which we do not address. Whatever duty burdened Mattiace as a result of the Agreement was narrowed, as to the space Returns occupied, by the Lease and Sublease.
¶ 13. An agent steps into the shoes of his principal and is his principal's alter ego. Aladdin Const. Co., Inc. v. John Hancock Life Ins. Co., 914 So.2d 169(¶10) (Miss.2005). The supreme court has held that "a lease `operates as a demise or conveyance of the property'" for the duration of the lease. Skelton v. Twin County Rural, 611 So.2d 931, 936 (Miss. 1992) (quoting Hurst v. English, 357 So.2d 132, 134 (Miss.1978)). As Mattiace was the owner's agent, Mattiace stepped into the shoes of the owner, whose duties with respect to the Returns' space were detailed in the Lease. The Lease stated that "the Lessor is not bound to make any repairs whatsoever" other than repairs relating to the roof, roof structure, exterior walls, and foundation. The Lease went on to state that the lessee was responsible for all other repairs. Lukacs accepted these duties and responsibilities through his entrance into the Sublease. Thus, even if the Agreement instilled a duty to maintain the interior of the Returns' space, the Lease and Sublease relieved the lessor of such duties while the Lease was in effect.
¶ 14. Wagner further argues that, if Mattiace did not have a contractual duty to maintain and repair the interior of the space, there would be no reason for McCormack to inspect the interior. The *884 Lease did reserve to the lessor, i.e., the owner, and in accordance with the familiar principle of agency law stated above, Mattiace, the right to enter and inspect the property, but this can hardly be interpreted to stand for the notion that as a result of this reservation the lessor retained a duty to keep the interior of the space in repair. To say otherwise would place the lessor in the unenviable position of leasing his property without reserving this right of inspection for fear that the lessor would be liable for harm resulting from any defects of the premises as the lessor would have a duty to repair all defects. In effect, the lessor would be leasing blind, never able to ensure the condition of his investment.
¶ 15. It would insult logic to say that the owner would intend to instill in Mattiace a duty to repair and maintain the interior of a space within the Plaza when the owner previously placed that duty with the lessee. It makes no difference how the Agreement between the owner and Mattiace is interpreted, the duty to maintain and repair the interior of the space where Returns was located had been squarely placed with a lessee, in this case Lukacs, since 1975. As such, Mattiace can not be said to have had a contractual duty to remove the substance on the floor of Returns that allegedly caused Wagner to fall and injure herself. Therefore, there being no genuine issue of material fact, we hold that Mattiace was not under a contractual duty to maintain or repair the interior of the Returns space, generally, or remove the substance which allegedly caused Wagner's injuries, specifically.
II. WHETHER MATTIACE ASSUMED A DUTY TO REMOVE THE SUBSTANCE WHEN IT MADE SOME INTERIOR REPAIRS AND HIRED A CLEANING COMPANY.
¶ 16. Wagner next argues that even if Mattiace did not have a contractual duty to remove the substance, it assumed such a duty when it made some repairs and hired a cleaning crew for the space prior to Returns opening for business.
¶ 17. Wagner cites Rein v. Benchmark Constr. Co., 865 So.2d 1134 (Miss.2004), for the proposition that when determining if a duty exists, an important component of the inquiry is whether the injury at hand was reasonably foreseeable. While that question is paramount in determining if a duty exists, Rein and other precedents show that foreseeability is not a factor to consider when determining if a duty is voluntarily assumed, as is the issue here.
¶ 18. The facts of Rein show that Mrs. Rein was bitten by fire ants while lying in her bed at Silver Cross Nursing Home and died of her injuries three days later. Rein, 865 So.2d at 1137. Her husband and son sued Silver Cross, Benchmark Construction Co., Ace Pest Control, and two landscaping companies, one of which being Growin Green Landscape, Inc. Id. Benchmark was hired by Silver Cross to build its facility and the Reins alleged that it failed to correctly construct the Silver Cross facility in that faulty site preparation, the condition of the fill dirt used, and the construction of the building itself caused moisture to build up. Id. at 1137-38. The Reins further alleged that this moisture attracted ants and other insects which caused the death of Mrs. Rein. Id. at 1137.
¶ 19. The plaintiffs also sued Growin Green. Id. at 1139. Growin Green was under contract with Silver Cross until one month prior to Mrs. Rein's death. Id. While current, the contract provided for initial landscaping and continued maintenance of Silver Cross's grounds, but the contract was silent as to fire ant treatment or control. Id. The Reins contended that the contract instilled in Growin Green an *885 obligation to treat for ants and provide advice on fire ant control. Id. at 1140. Alternatively, the Reins urged that even if no contractual duty existed, Growin Green assumed such a duty when Growin Green did make some effort to control ants on the grounds in order to protect Growin Green's equipment. Id. Growin Green countered that there was no contractual or assumed duty to control the fire ants, and even if there was an assumed duty that duty must be limited by the extent of the undertaking. Id. The Rein court found for Benchmark as the death of Mrs. Rein was deemed to be not reasonable foreseeable. Id. at 1146. In holding in favor of Growin Green and finding that it did not assume a duty, the supreme court analyzed the facts surrounding Growin Green's involvement in Silver Cross's apparent ant problem as opposed to the foreseeability of harm. Id. The supreme court further noted that "Silver Cross was not induced to forgo other methods of pest control in reliance on any assumed duty by Growin Green." Id. at 1147. Furthermore, the Rein court stated that even if Growin Green had assumed a duty to treat and control fire ants, the liability imposed must be limited to the undertaking they allegedly assumed. Id. This theory was asserted by Growin Green through authority from other jurisdictions. Id. at 1140-41. See, e.g., Morin v. Traveler's Rest Motel, Inc., 704 A.2d 1085 (Pa.Super.Ct.1997) (salting one portion of the parking lot is not an undertaking to salt it all).
¶ 20. Requiring a showing of reliance on the part of the injured individual to impose liability for an assumed duty is not a new concept in this State. Over five decades ago, the supreme court held in Higgins Lumber Co. v. Rosamond, 217 Miss. 1, 63 So.2d 408 (1953), that an agent could be held to a duty of reasonable care for a gratuitous undertaking if the plaintiff relied upon the agent's performance. The Fifth Circuit applied Higgins in Coleman v. Louisville Pants Corp., 691 F.2d 762 (5th Cir.1982), in finding that Mississippi law only imposes a duty of care for a gratuitous or voluntary undertaking if the plaintiff detrimentally relied on the defendant's undertaking. In Coleman, the employer attempted to secure benefits for his employees under the Trade Act of 1974 by mailing a petition to the employees' union, who was then supposed to send it to the Secretary of Labor. Coleman, 691 F.2d at 763-64. The union claimed it never received the petition, and the employees ended up losing their benefits. Id. at 764. The employees then brought suit against their former employer alleging the employer breached a voluntarily assumed duty to correctly file the petition. Id. at 766. In finding for the employer, the Fifth Circuit held that the employees failed to show that they relied or knew about the employer's attempt. Id.
¶ 21. This issue was also addressed by the supreme court in Century 21 Deep South Properties v. Corson, 612 So.2d 359, 368-69 (Miss.1992). There, a real estate agency was not found liable when they gratuitously promised a non-client they would perform a title work update and fulfilled that limited duty. Corson, 612 So.2d at 368. The Corson court stated, "Century 21 owed the Corsons a duty to use care in obtaining this update or to give notice that it would not obtain the update while the Corsons had other means available to obtain the update." Id. Higgins, Corson, and Rein show that in order for a party to be held liable for negligent performance of a gratuitous or voluntary act, the plaintiff must show detrimental reliance on the performance. Furthermore, the negligent party can only be held liable to the extent of the gratuitous undertaking.
*886 ¶ 22. With that legal framework in mind, we now turn to the facts at hand. In citing Rein, Wagner asserts that Mattiace is analogous to Benchmark in that if the injury Wagner suffered was reasonably foreseeable, a duty existed or was assumed by Mattiace to remove the substance that allegedly caused the injury. As our precedent shows, whether a party assumed a duty must be determined by the individual facts of the case and the existence or absence of detrimental reliance on that assumed duty. Therefore, Mattiace is more correctly compared to Growin Green rather than Benchmark. The distinction between the two is the difference between an existing duty to use a standard of care and the extension of that duty to encompass those injuries that are reasonably foreseeable (Benchmark), and a gratuitous assumption of a duty not previously in existence and detrimental reliance on that assumed duty (Growin Green).
¶ 23. It is undisputed that Mattiace made some repairs to the interior of the Returns space, namely it replaced some broken tiles, repaired some leaks in the plumbing, and swept and moped the floor to remove loose debris, in order to facilitate Lukacs's occupancy of the store. There was testimony from Lukacs that Mattiace also hired a professional cleaning company to further clean the space prior to Lukacs opening for business. Lukacs also testified that he asked about removing the substance on the ground when the tiles were being repaired and was told that Mattiace would not remove them. Even assuming that Mattiace assumed a duty to generally clean the interior of the Returns space in order to facilitate Lukacs's opening of the store, it can not be said that Mattiace assumed a duty to remove the substance. Any liability incurred by Mattiace must be limited to the duty it undertook, i.e., generally clean the space (not to include the substance), repair broken tile, and repair certain plumbing fixtures. Wagner did not allege that breach of any of these assumed duties caused her injuries.
¶ 24. Even if Mattiace did gratuitously assume a duty to remove the substances from the Returns space, there is no evidence in the record indicating that either Lukacs or Wagner detrimentally relied on that voluntarily incurred duty. Despite this lack of evidence, Wagner argues that once Mattiace assumed a duty to remove the substance they could not then relinquish their duty to complete the task once they had already breached said duty by not removing the substance. Restatement (First) of Agency § 378 (1933), quoted with approval in Higgins, 63 So.2d at 410, states in Comment b as follows,
The fact that one has gratuitously promised another to do an act does not of itself create a duty to perform it, nor does the giving of the service create a duty to continue the service. Unless there is consideration for the undertaking, the duty to perform is created only where performance is necessary in order to protect the other from the harm to his interests which otherwise would result from his reliance upon the performance. . . . Likewise, a gratuitous promisor may at any time terminate his duty to act by giving notice of his intention not to continue, unless before such time the promissee has changed his position in reliance upon his belief in or expectation of performance by the promisor. . . .
In contradiction to Wagner's argument, it is obvious that if Mattiace did, in fact, assume a duty to remove the substance, it could have relieved itself of such a duty at any time, unless Lukacs changed his position in reliance on said duty. As is evident from his own testimony, Lukacs was aware *887 that Mattiace did not intend to remove the substance from the time Mattiace had the broken tiles replaced, and he had two years from the time he learned this to the time of Wagner's accident to remove the substance himself, as was his duty under the Lease, Sublease, and common law of this State. It can hardly be said that Lukacs changed his position to his detriment in reliance of Mattiace's actions. Applying the facts in a light most favorable to Wagner, and affording Wagner every reasonable doubt, we find that there is no genuine issue of material fact, and hold that, as a matter of law, Mattiace did not assume a duty to remove the substances from the floor of the Returns space.
¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF PANOLA COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR. IRVING, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] Certain terms and conditions of the Lease were not made a part of the Sub-lease. None of which are pertinent to the case sub judice.