950 So.2d 1076 (2007)
Jim DOE, a minor by and through his Mother and next Friend, Mary DOE, Appellant
v.
WRIGHT SECURITY SERVICES, INC., Appellee.
No. 2005-CA-02198-COA.
Court of Appeals of Mississippi.
March 6, 2007.
*1077 Rick D. Patt, Shane F. Langston, Rebecca M. Langston, G. Joseph Diaz, Jr., Jackson, attorneys for appellant.
Joel W. Howell, III, Jackson, attorney for appellee.
Before KING, C.J., IRVING and GRIFFIS, JJ.
GRIFFIS, J., for the Court.
¶ 1. Jim Doe[1], through his mother and next friend Mary Doe, brought this action for personal injuries against Wright Security Services, Inc. ("Wright"). The circuit court entered a summary judgment in favor *1078 of Wright. Jim Doe appeals and argues that summary judgment was not proper because there were genuine issues of material fact in dispute and Wright was not entitled to a judgment as a matter of law. We find reversible error, and we reverse and remand for further proceedings.

FACTS
¶ 2. In April of 1998, Jim Doe was a ten-year-old student at Capitol City Alternative School in Jackson. The school teaches children who have been either expelled from their regular Jackson Public School for violent behavior or who have committed felonies.
¶ 3. The school had a bus drop off/pick up location at Livingston Road, in front of an abandoned fire station and next to a McDonald's restaurant. There were sixty students assigned to the bus stop. Their ages ranged from ten to seventeen. Jim Doe was one of two ten-year-olds at the stop.
¶ 4. Jackson Public School District ("JPSD") assigned three security guards to this bus stop. Two of the guards, Willie Norwood and Leila Poindexter, were employees of JPSD. Wright provided the third guard, Joseph Williams, Jr., under a contract to provide supplemental security services for JPSD. The guards monitored the students at the bus stop, rode the bus with the students, and monitored the students at school.
¶ 5. At the bus stop, the guards were there to prevent fights, to keep the students separated and not to let students leave the bus stop unescorted. There had been a history of fights at this bus stop. At school, the guards were to escort the students to the bathroom and not let them go there together. The same rules were to apply at school and at the bus stop. The guards were to stay at the bus stop until the last child was picked up by his/her parent.
¶ 6. On April 13, 1998, at approximately 3:34 p.m., Jim Doe asked one of the male guards if he could go to McDonald's to use the restroom. The guard gave Jim permission to go there unescorted. While in the bathroom, Jim was sexually assaulted by John Smith.[2] Smith was a fellow alternative school student. He was fifteen, and he was known as a particular troublemaker. Nevertheless, the guards would let Smith leave the bus stop without repercussion.
¶ 7. On July 13, 1999, Jim Doe brought this action against JPSD, the City of Jackson, Stanley E. Wright, and Wright Security Services, Inc. Jim Doe brought an earlier interlocutory appeal to the supreme court. The court reversed the trial court's exclusion of Jim Doe's expert witness. Thereafter, Jim Doe settled with JPSD. The City and Stanley Wright were subsequently dismissed. The day before trial, which was scheduled for September of 2005, the trial court granted Wright's motion for summary judgment. The court found no issues of material fact as to duty and foreseeability. The court determined that Wright did not have a duty to protect Jim Doe while he was at McDonald's, and that Jim Doe's specific injury of rape was unforeseeable. It is from this judgment that Jim Doe appeals.

STANDARD OF REVIEW
¶ 8. This Court employs a de novo standard of review of a lower court's grant or denial of summary judgment and examines all the evidentiary matters before itadmissions in pleadings, answers to interrogatories, depositions, affidavits, etc. *1079 McMillan v. Rodriguez, 823 So.2d 1173, 1176-77 (¶ 9) (Miss. 2002) (citations omitted). The evidence must be viewed in the light most favorable to the party against whom the motion has been made. Id. at 1177 (¶ 9). If, in this view, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his or her favor. Id. Issues of fact sufficient to require reversal of a summary judgment obviously are present where one party swears to one version of the matter in issue and another says the opposite. Id.
¶ 9. Jim Doe also argues that a de novo review is necessary because the trial court adopted verbatim the order submitted by Wright's counsel. See Miss. Dep't of Transp. v. Johnson, 873 So.2d 108, 111 (¶ 8) (Miss. 2004). Since our standard of review of summary judgments is de novo, whether the trial court adopts the verbatim order/judgment offered by counsel or independently authors the order/judgment does not change the standard.

ANALYSIS
I. Whether the trial court committed error by granting summary judgment in the matter on the basis that there was no duty owed to minor Jim Doe by Wright, in spite of the clear duty owed and numerous, material issues of fact remaining which should have been properly submitted to the jury.
¶ 10. The trial court held that "the incident happened off the premises in an area the guard had no duty to protect and, therefore, there was no breach of duty." The court further concluded that "the guard followed his sole legal duty, which was to monitor, supervise, and protect the children on the premises of the abandoned station." Jim Doe claims that the trial court was in error in this ruling. Jim Doe argues that Wright had a duty to protect him. In particular, Jim claims that the guards were hired to prevent children from leaving the drop off location alone and were not to leave the premises themselves until all children had been picked up by their parents. Wright contends that it had no duty to protect Jim after he left the bus stop.
¶ 11. To prove Wright's negligence at trial, Jim must prove by a preponderance of the evidence that (1) Wright owed him a duty of care, (2) Wright breached that duty, and (3) this breach proximately caused (4) Jim's damages. Lyle v. Mladinich, 584 So.2d 397, 398-99 (Miss. 1991). If a triable issue of fact regarding each of these elements exists, then summary judgment must be reversed. Id at 399.
¶ 12. Whether a duty is owed is a question of law. Rein v. Benchmark Constr. Co., 865 So.2d 1134, 1143 (¶ 29) (Miss. 2004). The general duty is to act as a reasonable prudent person would under the circumstances. Donald v. Amoco Prod. Co., 735 So.2d 161, 175 (¶ 48) (Miss. 1999). "[T]he important component of the existence of the duty is that the injury is `reasonably foreseeable.'" Rein, 865 So.2d at 1143 (¶ 29) (quoting Lyle, 584 So.2d at 399). "When the conduct of the actor is a substantial factor in bringing about the harm to another then, `the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.'" Id. at 1144-45 (¶ 34) (quoting Restatement (Second) of Torts § 435 (1965)). "[D]efendants `cannot escape liability because a particular injury could not be foreseen, if some injury ought to have been reasonably anticipated.'" Id. at 1145 (¶ 34) (quoting Delta *1080 Elec. Power Ass'n v. Burton, 240 Miss. 209, 219, 126 So.2d 258, 261 (1961)).
¶ 13. A duty also exists where a party contracts to undertake or otherwise assumes a duty. See, e.g., id. at 1144-45 (¶¶ 36-37); Wagner v. The Mattiace Co., 938 So.2d 879 (Miss.Ct.App. 2006); Hobson v. Waggoner Eng'g, Inc., 878 So.2d 68, 76 (¶¶ 27-30) (Miss.Ct.App. 2003). This duty extends to third party beneficiaries. Rein, 865 So.2d at 1145 (¶ 37). As the Rein court explained:
In order for a third person beneficiary to have a cause of action, the contracts between the original parties must have been entered into for his benefit, or at least such benefit must be the direct result of the performance within the contemplation of the parties as shown by its terms. There must have been a legal obligation or duty on the part of the promisee to such third person beneficiary. This obligation must have a legal duty which connects the beneficiary with the contract. In other words, the right (of action) of the third party beneficiary to maintain an action on the contract must spring from the terms of the contract itself.
Id. at 1146 (¶ 38).
¶ 14. Applying these rules in Rein, the supreme court reversed a summary judgment. In Rein, a nursing home patient died as a result of a fire ant attack, while she was in bed. Id. at 1136-37 (¶ 2). Her husband brought a wrongful death action against, inter alia, Natural Accents, a landscaping company retained by the nursing home. Id. at 1137 (¶ 2). The supreme court noted there was a proposal that indicated that Natural Accents had contracted with the nursing home to provide "ant bed control." Id. at 1148 (¶ 42). The court held:
That evidence shows, as a matter of law, that Natural Accents obligated itself, by its own express terms, to some duty to inspect and treat ant beds at Silver Cross. The scope of that duty is a proper question for the trier of fact. The foreseeability of Mrs. Rein's injuries and death to Natural Accents is also a jury question. Further, the same trier of fact should determine the significance as related to causation of the failure by Natural Accents to comply with the terms of the contract.
Id.
¶ 15. Rein instructs our decision here. The undisputed facts indicate that Wright contracted with JPSD to provide security services for the alternative school students at the Livingston Road bus stop. Thus, as a matter of law, Wright obligated itself to a duty to protect the alternative school students, including Jim. Based on the evidence submitted in opposition to the motion for summary judgment, one purpose of Wright's contract with JPSD was to prevent violence or altercations among the alternative school students. Not only does this tend to make the incident foreseeable, but it shows as a matter of law that Wright owed a duty to minimize risks to Jim's safety.
¶ 16. In granting the summary judgment, the trial court applied premises liability law and held that Wright did not have a duty to protect Jim once he stepped off the premises, i.e., the actual corner bus stop. In the judgment, the trial court held:
[Jim Doe]'s complaint alleges a guard employed by [Wright] failed to properly monitor, supervise, use reasonable care and/or to take adequate security precautions and/or measures to protect the children at his designated bus stop, such failure leading to [Jim Doe]'s sexual assault. To state a claim for negligence [Jim Doe] must show [Wright] owed a *1081 duty to [him], [Wright] breached that duty, and damages proximately resulted from that breach. Lyle v. Mladinich, 584 So.2d 397, 399 (Miss. 1991).
The law specifically states "A security company hired to protect business premises owes no greater duty toward the patrons of that business than is owed by the business owner under the relevant premises liability law." Balard v. Bassman Event Security, Inc., 210 Cal. App.3d 243, 247[, 258 Cal.Rptr. 343] (Cal.App.2d Dist., 1989). Furthermore, a security guard, just like a landowner, owes no duty to protect an invitee from criminal acts committed by a third party outside the boundaries of his premises. Id.

¶ 17. To support the trial court's analysis, Wright's brief cites three legal authorities: Lyle, Balard and Isaacs v. Huntington Memorial Hospital, 38 Cal.3d 112, 211 Cal.Rptr. 356, 695 P.2d 653, 664 (1985). Isaacs is cited for the proposition that "[a] defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control. Where the absence of ownership, possession or control has been unequivocally established, summary judgment is proper." Id. Wright cites us to no controlling Mississippi authority. Thus, to uphold the summary judgment, we must conclude that this is a premises liability action, and Wright owed no duty to Jim Doe. This is where we find reversible error.
¶ 18. Indeed, this is not a premises liability case. There is no claim that Jim Doe was injured as a result of a dangerous or defective condition at the bus stop. We do not consider whether JPSD or Wright owes Jim Doe, as an invitee or business visitor, "a duty to exercise ordinary care to keep the premises in a reasonably safe condition or to warn the invitee of dangerous conditions, not readily apparent, which the owner or occupier knows of or should know of in the exercise of reasonable care." Waller v. Dixieland Food Stores, Inc., 492 So.2d 283, 285 (Miss. 1986). Instead, the duties of care result from Wright's contract with JPSD to provide security services at the bus stop for the students attending the alternative school.
¶ 19. Jim Doe suggests that there were several legal duties that should be considered and, when considered, prohibit the entry of a summary judgment.
A. Duty to keep students at the bus stop
¶ 20. Elijah Buckley was the principal of the alternative school. In his deposition, Principal Buckley testified that he conducted an orientation with Wright security personnel. In the orientation, he instructed Wright that "[t]he safety and the well-being and the security of the students is first and foremost." Buckley testified that if a child tried to leave the bus stop, the Wright guards were to call the student back and warn him not to leave. Buckley further instructed the guards to, "[m]ake sure that they [the children] stay at the designated location." This was to be done with verbal commands and warnings. Buckley testified that there was no proper way for a security guard to allow a child off the bus stop. According to Buckley, "There's no proper way to do it, unless the student is escorted off by the parent. The parent would come and pick up and say, `Now he's in my custody, and we'll walk across there. . . .' That would be the only proper way."
¶ 21. Jerry Luckett was the head of JPSD security for the alternative school. He testified that when Wright personnel came on-site, the two existing JPSD officers on-site would go over policy and procedure with the Wright personnel. Specifically, Wright was instructed, "[w]hen the *1082 kids get there, be sure theythey come to the site and they stay at the site. They didn't [sic] supposed to leave the site." Luckett testified that the procedures did not allow Wright personnel to give any child permission to leave.
¶ 22. Norwood, one of the JPSD guards, testified that if he saw some students away from the bus stop, he would go over and try to escort the students back to the bus stop, provided there was one other security guard at the bus stop. Poindexter, another of the JPSD guards, testified that her duty as a guard was to make sure the children did not leave the bus stop.
¶ 23. There was evidence that this duty had been breached. Stanley Wright testified:
Now, I did ask JosephI asked him specificallyyou know, I said, I asked him, "Well, Joe, how had you all been dealing with students leaving?" Joe's response to me was that they had been leaving all the time. He told me, "Chief, they leave all the time. And we don't run after them."
¶ 24. Jim Doe testified that the guards would let the students go to McDonald's to get something to eat. All the children had to do was ask permission, and they were allowed to go. At the time in question, Jim claims that he was given permission to go to McDonald's. Williams, the Wright guard, also testified that when students asked permission to use the restroom he would say go and come right back. Williams testified that Smith, the sexual offender, would always walk away from the bus stop.
B. Duty to report students who wandered from the bus stop
¶ 25. Buckley instructed Wright security personnel, "I said, Now, you can't catch a child and hold him and keep him from leaving, I said, but you must report it." Likewise, Luckett testified that he told Wright employees they could not physically restrain a child from leaving. If he insisted on leaving, Wright was to "[g]et the child's name, write him up, and turn it in to the principal when he got to the school. . . . Well, when he turned it in to the school, the school would contact the child's parents." Norwood testified that, in the event a student wandered from the bus stop, the procedure required the guards "[t]o write him up and turn it into Mr. Buckley the next morning in the office."
¶ 26. Stanley Wright indicated this duty, too, was breached:
Q. Okay. If JPS required that Wright Securitysecurity guard to write up anything about a child leaving the premises, would that write-up also go in that security guard's file at Wright Security?
A. Yes.
. . . .
Q. Okay. And in this file, there's nothing about any students ever leaving the property at the drop-off site in Joseph Williams' file? He never wrote that up and put a copy in his file?
A. No, he did not.
Williams testified that he never filled out such a report, because he was never told by Wright nor JPS to do it.
C. Duty to escort students to the bathroom
¶ 27. Buckley testified that if a child wanted to go to the bathroom at school, he was not allowed to go with other students and the child was to be escorted. He testified the same rules that applied at school applied at the bus stop as well. Hypothetically, Norwood testified that if a child were in danger of using the bathroom *1083 on himself while at the bus stop, he would be escorted to the nearby McDonald's bathroom.
¶ 28. Norwood testified he never escorted and never saw another security guard escort a child over to McDonald's. Jim testified that all the students had to do was ask permission, and the guards let the students go to McDonald's on their own. Williams admitted that he would not escort the children to the bathroom. Just before the incident in McDonald's, Jim was permitted to go unescorted to the McDonald's bathroom.
D. Duty to remain at the bus stop until all students left
¶ 29. Stanley Wright testified that his guards were required to stay at the bus stop until all the children had been picked up by their parents, no matter how late. To do otherwise would have been a violation of Wright's internal rules and Wright's duty to provide security pursuant to its contract with JPSD. Likewise, Williams testified he was to stay there until the last child left.
¶ 30. There was evidence that this duty was breached. Norwood testified he and Poindexter stayed at the bus stop until five p.m. the day in question, but he did not know what happened to Williams. Poindexter testified that Williams was not at the bus stop at the time of the incident, because he had left early. There were approximately forty-two students remaining at the bus stop at this time. Jim testified that only two guards were at the bus stop, one man and one woman.
E. Duty to prevent altercations between the students
¶ 31. During orientation, Buckley instructed Wright security guards, "We keep the students separated and separate them and don't allow them to cluster up or get in a push-and-shove match, horseplaying, or anything of that nature, and just be a supervisor."
¶ 32. Stanley Wright testified that the duty of his security personnel assigned to the school was to "monitor what students were doing, and to try and keep them in line." He further stated:
A. As far as the drop-off site was concerned, like in this case with Jackson Alternative School, there were students here who were at the school because they had more than likely done something wrong at one of the regular schools.
Q. Okay.
A. Our officers were requiredrequired to catch the bus with them in the morning, and ride to the school with them because there had been a lot of incidents where they would be fighting on the parking lot before they got on the bus, or they might even fight on the bus.
So we would have to board the bus with them in the morning, go to the school, spend a day at the school with them, and then ride back to the parking lot and stay there until they got picked up.
¶ 33. Balard may be distinguished in this regard. In Balard, an adult female restaurant customer left the restaurant's premises and went across the street where her car was parked in another lot. 210 Cal.App.3d at 246, 258 Cal.Rptr. 343. There she was sexually assaulted by men parked in an automobile. Id. About ten to fifteen minutes before the assault, the guard located outside the door of the restaurant was advised by other customers that some men were intoxicated, sitting in a car and verbally harassing patrons. Id. The California court determined that the security company owed the patron the *1084 same duty as owed by the owner of the restaurant. Id. at 247, 258 Cal.Rptr. 343. Thus, the court determined that the security company's duty to the patron from third party criminal acts was confined to the restaurant's premises. Id. at 250, 258 Cal.Rptr. 343. The court noted and Balard conceded that the security guard was hired to protect the restaurant. Id. at 246-47, 258 Cal.Rptr. 343. The court also recognized that the guard did not have a:
"duty to control another's conduct or to warn those who may be endangered by such conduct. However, a duty may arise where a special relationship exists giving rise to a right to such protection." [citation omitted]. Such a special relationship exists "between a business establishment and its customers [which] as a matter of law places an affirmative `duty' on the proprietor to take reasonable precautions to protect patrons from reasonably anticipative criminal conduct of unknown third parties."
Id. Here, the security guard was hired to protect the students, not the business premises. The purpose of Wright's presence at the bus stop was to reduce or eliminate violence by the students who attended the alternative school. Indeed, from the testimony indicated above, Wright had a duty to control the conduct of both the victim, Jim Doe, and the attacker, John Smith. This was precisely the type of conduct that JPSD attempted to prevent when it hired Wright to provide supplemental security at this bus stop.
¶ 34. Further, in a similar sexual assault case, the Mississippi Supreme Court held that "public schools have the responsibility to use ordinary care and take reasonable steps to minimize risks to students thereby providing a safe school environment." L.W. v. McComb Separate Mun. Sch. Dist., 754 So.2d 1136, 1141 (¶ 24) (Miss. 1999). The court concluded that public schools had a statutory duty to minimize the risks to students and provide a safe environment; specifically, the court held that:
It shall be the duty of each superintendent, principal and teacher in the public schools of this state to enforce in the schools the courses of study prescribed by law or by the state board of education, to comply with the law in distribution and use of free textbooks, and to observe and enforce the statutes, rules and regulations prescribed for the operation of schools. Such superintendents, principals and teachers shall hold the pupils to strict account for disorderly conduct at school, on the way to and from school, on the playgrounds, and during recess.

Miss.Code Ann. § 37-9-69 (emphasis added). This statute mandates that school personnel maintain appropriate control and discipline of students while the children are in their care. Furthermore, the State of Mississippi mandates compulsory school attendance for all children upon penalty of law. Miss. Code Ann. § 37-13-91 (Supp. 1998). [footnote omitted]. Since the state requires all children to be enrolled in school, it only seems logical that the state should then require school personnel to use ordinary care in administering our public schools.
Id. at 1141-1142 (¶ 25). L.W. alleged negligence in maintenance and supervision of the premises. Id. at 1143 (¶ 29). The court determined that public schools "have the responsibility to use ordinary care to provide a safe school environment." Id. (quoting Bd. of Trs. of the Pascagoula Mun. Separate Sch. Dist. v. Doe, 508 So.2d 1081, 1085 (Miss. 1987)). The court reversed and remanded the trial court's dismissal *1085 of L.W.'s complaint for damages against the school district. Id.
¶ 35. Accordingly, we hold that there was a genuine issue of material fact in dispute as to whether Wright breached the legal duty(ies) that were owed. We reverse and remand for further proceedings consistent with this opinion.
II. Whether the trial court erroneously ruled that the criminal attack on Jim Doe was not foreseeable, in spite of the evidence to the contrary and the numerous, material issues of fact remaining which should have been properly submitted to the jury on this issue.
¶ 36. Jim Doe next argues that there was a genuine issue of material fact as to whether his injuries were foreseeable. In particular, Jim notes that Wright was aware that the students were at the alternative school because they had behavioral/criminal issues. Wright responds that Jim's sexual assault was unforeseeable, because there was no history of crimes at the bus stop and no history of sexual crimes against minors at the bus stop.
¶ 37. Causation, like duty, involves questions of foreseeability. Rein, 865 So.2d at 1143 (¶ 30). Unlike duty, causation is a question of fact. Id. In premises liability cases, a criminal act is foreseeable if the owner had actual or constructive knowledge of the assailant's violent nature, or actual or constructive knowledge that an atmosphere of violence existed on the premises. Grisham v. John Q. Long V.F.W. Post, 519 So.2d 413, 416-17 (Miss. 1988). Further, Jim's particular injury of sexual assault need not be foreseeable if some injury to him was foreseeable. Rein, 865 So.2d at 1145 (¶ 34) (quoting Delta Elec. Power Ass'n v. Burton, 240 Miss. 209, 126 So.2d 258, 261 (1961)).
¶ 38. In deciding this issue, the trial court relied on the affidavit of Ralph Day, Wright's security expert. The court found:
As stated in Mr. Day's testimony, there was no evidence in the exhibits reviewed that lists any history of crimes against persons having occurred at the locations where the students were dropped off and picked up in connection with their transportation to and from school facilities. In addition, there was no evidence of any sexually related crimes ever having occurred or been reported in connection with the school pick up program at this location.
This was close to an exact quotation from Mr. Day's affidavit. In the affidavit, Mr. Day does not state what exhibits he reviewed and no exhibits were provided in the record. The trial court found this testimony uncontradicted.
¶ 39. We disagree and find that the evidence offered by Mr. Day was contradicted by several witnesses. In fact, in the very next paragraph of Mr. Day's affidavit, he states, "Records from the Jackson Police Department were reviewed with regard to Reporting Zone 5668 where the pick up point and McDonald's are located." During April 25, 1997 to March 31, 1998, "[t]here were nine crimes against persons listed. They were for armed robbery, simple assault or aggravated assault." Buckley testified he was familiar enough with the Livingston Road area to know to assign more guards to that stop than to others.
¶ 40. Besides a history of criminal activity perpetrated by third parties, more relevant is the evidence of fights between the alternative school students themselves. In fact, it was Stanley Wright who testified that the reasons Wright was there was to *1086 prevent violence among the students and in fact there had been a history of fighting at the bus stop and on the bus.
¶ 41. Buckley testified he told Wright personnel that they were there to prevent fights. Luckett testified that there had been a fight at the Livingston Road bus stop previously that same school year. He said that the nature of the alternative school children required tighter security to monitor the children at all times. He said the children were there because they had a history of violent and criminal behavior.
¶ 42. Finally, there was evidence that Jim Doe and John Smith had separate histories of altercations. The guards described Jim as a quiet child, who was one of the smallest and youngest at the bus stop. Jim testified that a fight had been started with him at the bus stop at one point by one student, and another kid "used to pick on me all the time." Williams testified that Smith:
was one of those kids thatthat pretty much had his own way. Pretty much he run [sic] the hall in the school, you know, just jump up out of class, you know, different things.
Q. You knew him to be a problem?
A. Yes. He was all right, but he was he was a problem, yeah.
Q. Did you ever have to break up a fight that involved [Smith]?
A. Not really [Smith]. He didn't take nothingnow, he always pick a fight.
¶ 43. We find this evidence created a genuine issue of material fact as to whether Jim's injuries were foreseeable. Therefore, we reverse the summary judgment entered in favor of Wright and remand this case for further proceedings.
¶ 44. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] To protect the identity of the victim and his family, we use fictitious names.
[2] Because the offender is a minor, we use a fictitious name to protect his identity.