# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2012-CA-01757-COA

KATERINA GALANIS AND CHRISTINA
GALANIS      APPELLANTS

v.

CMA MANAGEMENT COMPANY FORMERLY      APPELLEES
D/B/A AMBLING MANAGEMENT COMPANY,
AMBLING MANAGEMENT COMPANY, LLC,
FORMERLY D/B/A AMC ACQUISITIONS, LLC,
AMBLING MANAGEMENT COMPANIES, INC.
AND ALTA MSU, LLC

| | |
|---|---|
| DATE OF JUDGMENT: | 09/28/2012 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | SEAN ROBERTS GUY |
| | SEAN J. TINDELL |
| ATTORNEY FOR APPELLEES: | DAVID L. SANDERS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' MOTION FOR SUMMARY JUDGMENT |
| DISPOSITION: | AFFIRMED - 11/04/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ROBERTS AND FAIR, JJ.**

**ROBERTS, J., FOR THE COURT:**

¶1.     Bobby Batiste murdered his roommate, Andreas Galanis, in the apartment that they

shared at 21 Apartments in Starkville, Mississippi.  Andreas's mother, Katerina Galanis, and

his sister, Christina Galanis, (the Galanises) sued Batiste[1] and the companies[2] that owned and managed 21 Apartments. According to the Galanises, 21 Apartments negligently failed to warn Andreas of Batiste's violent tendencies. 21 Apartments moved for summary judgment and argued that there was no evidence that it had actual or constructive knowledge of Batiste's propensity for violence, so it had no duty to warn Andreas. The Oktibbeha County Circuit Court agreed. The Galanises appeal. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. 21 Apartments began leasing apartments during August 2006. Located near the campus of Mississippi State University, 21 Apartments was marketed toward college students. Batiste was one of 21 Apartments' original tenants.

¶3. During 2007, 21 Apartments hired Ambling Management Company LLC to manage the apartments. Ambling instituted a policy of performing background checks through an outside service on all people who applied for new leases and existing tenants who sought to renew their leases. If the applicant was ineligible to lease an apartment due to his prior criminal history, the applicant received a letter informing him of the negative results. 21 Apartments did not receive a comprehensive list of the applicant's criminal record.

¶4. When Batiste sought to renew his lease during 2007, his background check indicated

---

[1] Batiste filed a pro se answer. He denied that he was liable for Andreas's death.

[2] At the time Batiste killed Andreas, 21 Apartments was owned by Alta MSU LLC and managed by Ambling Management Company. For the sake of brevity, we refer to the Appellees collectively as 21 Apartments in this opinion unless stated otherwise.

2

that he had a prior criminal history. Consequently, 21 Apartments told Batiste that his renewal application had been denied. A few months later, attorney James A. Williams faxed a letter to 21 Apartments and explained that Batiste was "not a convicted felon." Williams further explained that Batiste had been charged with credit-card fraud. According to Williams, although Batiste had pled guilty, Batiste's case had been "non-adjudicated, which means that he submitted to probation, but [he] was not convicted." Williams attached a copy of Batiste's non-adjudication order.[3] Because 21 Apartments' policy prohibited leasing to anyone who had been convicted of a crime, and Batiste had not been adjudicated guilty of credit-card fraud, 21 Apartments allowed him to renew his lease.

¶5. Months later, Andreas applied to lease an apartment. He was instantly approved. To help tenants find roommates, 21 Apartments provided a questionnaire regarding each tenant's study habits, social lifestyle, and other factors. Although 21 Apartments notified tenants of potential roommates and introduced them, it was up to the individual tenants to select a roommate. In other words, 21 Apartments did not force any particular tenants to share an apartment. 21 Apartments introduced Andreas and Batiste because they were both football fans, and they were both older than traditional college students. After Andreas and Batiste

---

[3] Batiste was not convicted of credit-card fraud. Instead, the circuit court deferred the acceptance of his guilty plea, and placed him on non-adjudicated probation for four years and ordered him to pay restitution. Presumably, if Batiste had satisfactorily completed his non-adjudicated probationary term, the charge would have been dismissed and expunged from his record as set forth in Mississippi Code Annotated section 99-15-26 (Supp. 2014).

3

met, they chose to become roommates.[4]

¶6.    Leasing consultant Lorenzo Butler thought that Andreas and Batiste were close friends.  During his deposition, Butler said that Andreas and Batiste "were together all [of] the time."  Andreas and Batiste both told Butler that they liked living together.  According to bookkeeper[5] Debbie Owen, Andreas and Batiste "were best friends."  Owen added that "wherever you saw [Andreas or Batiste], you saw the other."

¶7.    However, on March 6, 2008, Andreas told Owen that his debit card had been used without his permission, and he suspected that Batiste was responsible.  Owen advised Andreas to file a report with the Oktibbeha County Sheriff's Department.  Andreas followed Owen's advice and spoke with Deputy Steven Woodruff.  Deputy Woodruff asked Andreas if he wanted to file charges against Batiste, but Andreas declined.  Andreas told Deputy Woodruff that he wanted to try to resolve the issue with Batiste.

¶8.    Sometime after Andreas returned to his apartment, Batiste killed him.  Batiste was later convicted of capital murder and sentenced to death.  *Batiste v. State*, 121 So. 3d 808, 823 (¶1) (Miss. 2013).  On direct appeal, the Mississippi Supreme Court affirmed Batiste's conviction and sentence.  *Id.*

---

[4]    Andreas and Batiste were both twenty-seven years old when they became roommates.  They were also both students at Mississippi State University.  An international student named Jaewoo Joo also shared an apartment with Andreas and Batiste, but he had returned to South Korea before Batiste went to trial for capital murder.

[5]    Owen began working for 21 Apartments during July 2006.  Sometime between then and March 2008, Owen had been promoted to assistant manager.  Even so, Owen said that her employment responsibilities did not change much.

4

¶9. In March 2009, the Galanises sued 21 Apartments and Batiste. According to the Galanises, 21 Apartments "knew or . . . should have known that [it] failed to provide . . . reasonabl[y] safe premises for Andreas . . . ." The Galanises also claimed that 21 Apartments was liable for Andreas's death because it had failed to warn him of Batiste's criminal history or his violent tendencies "before assigning him to share living space with . . . Batiste."

¶10. More than three years later, 21 Apartments filed a motion for summary judgment. Among other things, 21 Apartments argued that summary judgment was appropriate because it did not have actual or constructive knowledge that Batiste was a violent person, so it had no duty to warn Andreas of Batiste's violent personality. The circuit court agreed and granted 21 Apartments' motion for summary judgment.[6] The Galanises appeal.

## STANDARD OF REVIEW

¶11. An appellate court conducts a de novo review of a trial court's decision to grant a motion for summary judgment. *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 174 (¶14) (Miss. 2009). Mississippi Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered . . . if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." We must review the evidence in the light most favorable to the nonmoving party. *Kilhullen*, 8

---

[6] The circuit court later entered a corrected order finding that it was a final judgment as set forth in Rule 54(b) of the Mississippi Rules of Civil Procedure. Although he is presently sentenced to death, Batiste remains a viable defendant to the Galanises' lawsuit.

So. 3d at 174 (¶14).

¶12.    To overcome a motion for summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth specific facts showing there is a genuine issue for trial." M.R.C.P. 56(e). The Mississippi Supreme Court has recently held:

> [I]n a summary[-]judgment hearing, the burden of producing evidence in support of, or in opposition to, the motion is a function of Mississippi rules regarding the burden of proof at trial on the issues in question. The movant bears the burden of persuading the trial judge that: (1) no genuine issue of material fact exists, and (2) on the basis of the facts established, he is entitled to [a] judgment as a matter of law. The movant bears the burden of production if, at trial, he would bear the burden of proof on the issue raised. In other words, the movant only bears the burden of production where [he] would bear the burden of proof at trial. Furthermore, summary judgment is appropriate when the non[]moving party has failed to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.

*Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 88-89 (¶11) (Miss. 2013) (quotations omitted).

## ANALYSIS

### I.    DUTY TO WARN

¶13.    The Galanises claim that the circuit court erred when it held that 21 Apartments did not have a duty to warn Andreas that Batiste was a violent person. According to the Galanises, the circuit court should have found that 21 Apartments had actual or constructive knowledge of Batiste's violent personality. Therefore, the Galanises reason that 21 Apartments had a duty to warn Andreas of Batiste's personality.

6

¶14.    This is clearly a premises-liability case. "Premises liability is a theory of negligence that establishes the duty owed to someone injured on a landowner['s] premises as a result of 'conditions or activities' on the land." *Double Quick Inc. v. Moore*, 73 So. 3d 1162, 1165 (¶8) (Miss. 2011) (quoting *Doe v. Jameson Inn Inc.*, 56 So. 3d 549, 553 (¶11) (Miss. 2011)). To successfully demonstrate negligence, a plaintiff must prove that (1) the defendant had a duty "to conform to a specific standard of conduct for the protection of others against the unreasonable risk of injury"; (2) the defendant breached that duty; (3) there is a causal relationship between the breach and the alleged injury; and (4) the plaintiff suffered "injury or damages." *Rein v. Benchmark Constr. Co.*, 865 So. 2d 1134, 1143 (¶30) (Miss. 2004). The primary issue in this case is whether 21 Apartments had a duty to warn Andreas that Batiste was a violent person. We are mindful that "the existence . . . of a duty of care is a question of law." *Id.* We review questions of law de novo. *Pascagoula Sch. Dist. v. Tucker*, 91 So. 3d 598, 603 (¶8) (Miss. 2012).

¶15.    It is undisputed that Andreas was an invitee.[7] "[A] property owner is not the insurer of an invitee's safety. Instead, a 'premises owner must employ reasonable care to protect an invitee from 'reasonably foreseeable injuries at the hands of another.'" *Holmes v. Campbell Props. Inc.*, 47 So. 3d 721, 725 (¶14) (Miss. Ct. App. 2010) (quoting *Newell v. S. Jitney Jungle Co.*, 830 So. 2d 621, 623 (¶6) (Miss. 2002)). "An assault on the premises is

---

[7] "An invitee is a person who enters the premises of another in response to an express or implied invitation of the owner or occupant for their mutual advantage." *Moore*, 73 So. 3d at 1166 (¶12).

reasonably foreseeable[8] if the defendant had either: (1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge an atmosphere of violence existed on the premises." *Id*. "[T]he important component of the existence of the duty is that the injury is 'reasonably foreseeable,' and thus it is appropriate for the trial judge to decide." *Rein*, 865 So. 2d at 1143 (¶29) (quoting *Lyle v. Mladinich*, 584 So. 2d 397, 399 (Miss. 1991)).

¶16. The Galanises do not argue that there was an atmosphere of violence at 21 Apartments. Instead, they argue that 21 Apartments had actual or constructive knowledge that Batiste was a violent person. According to the Galanises, 21 Apartments should have realized that Batiste was a violent person based on a "resident-concern form" that Batiste submitted regarding one of his previous roommates.

¶17. Before Batiste and Andreas were roommates, Batiste's roommates were Arthur Hosey and Demarcus Cousins. Approximately one year before Batiste killed Andreas, Batiste submitted a resident-concern form regarding Hosey's poor housekeeping. Within the resident-concern form, Batiste stated:

> Since October . . . 2006, [Hosey] has been messing up the living area and not cleaning it up. Our kitchen is so messy that we have flies now. A[ ]lot of them [are] dead on the floor. To resolve this earlier, I took it upon myself to clean the whole living area twice. That failed because it [became] dirty [again]. I

---

[8] It is necessary to distinguish foreseeability in the context of the existence of a duty, and foreseeability in the context of causation. "While duty and causation both involve foreseeability, duty is an issue of law, and causation is generally a matter for the jury. Juries are not instructed in, nor do they engage in, consideration of the policy matters and the precedent which define the concept of duty." *Rein*, 865 So. 2d at 1143 (¶30).

8

have also tried talking to him about keeping it clean. It goes in one ear and out [of] the other. There have been times when [other people] have come down. They can be a witness to it. Even [property manager] Nandra [Jackson] has seen the mess. I can't take it anymore. I don't want to get violent. He's had to[o] many chances. I wish he would leave now[,] because I can't stay in an environment where every[ ]time I turn around[,] I have a fly in my room. I keep my things clean and my room organized. He doesn't even take out the trash. I hope this get[s] resolved soon because I really don't want to take matters into my own hands.

According to the Galanises, Batiste's statements that he did not "want to get violent" and he did not "want to take matters into [his] own hands" put 21 Apartments on notice that Batiste was a violent person. Additionally, the Galanises note that Owen, the bookkeeper and assistant manager at 21 Apartments, swore in an affidavit that she had no reason to believe that Batiste was a violent person before he killed Andreas. The Galanises further note that during Owen's deposition, she was confronted with Batiste's resident-concern form. After repetitive questioning by one of the Galanises' lawyers, Owen relented and testified that she would not have signed her affidavit if she would have been aware of Batiste's resident-concern form. The Galanises reason that there was a genuine issue of material fact regarding whether 21 Apartments had a duty to warn Andreas that Batiste was a violent person.

¶18. However, even in the context of summary judgment, the existence of a duty is a question of law. *Rein*, 865 So. 2d at 1143 (¶30) (affirming in part a trial judge's decision to grant a motion for summary judgment based on the absence of a duty). It follows that the existence of a duty is not a question of fact. "[T]herefore, the ruling by the trial court was a judgment call as a matter of law, but certainly not impermissible." *Id*. at 1144 (¶31).

¶19. Essentially, the Galanises argue that 21 Apartments should have known that Batiste

9

was a violent person because he said he did not want to "take matters into his own hands" or use violence to resolve a dispute. However, there is no evidence that 21 Apartments had any reason to think that Batiste had been violent with his former roommate.

¶20. Additionally, it is unreasonable to view Batiste's resident-concern form in a vacuum as though 21 Apartments only had it as a means to determine whether Batiste was a violent person. The Galanises deposed three people who had worked at 21 Apartments at the time that Batiste lived there. According to Owen, Batiste frequently visited the office multiple times each week. Within her affidavit, Owen described Batiste as "very nice and helpful." She added that "he was extremely outgoing, friendly[,] and kind," and he "appeared . . . to be a very peaceful person." Jackson described Batiste in similar terms.

¶21. Butler, the former leasing consultant for 21 Apartments, said that he "would have considered [Batiste to be] a friend . . . ." Butler also said that "everyone liked" Batiste. Butler used the following terms to describe Batiste: personable, funny, nice, mannerable, friendly, pleasant, and very respectable. Butler stated that it was "hard not to like someone like that."

¶22. Butler also personally observed Batiste when Batiste operated the gate to the apartments during a few weekends when Mississippi State University had home football games. According to Butler, Batiste did "a fantastic job." Butler explained that Batiste had to turn away some people who did not live at 21 Apartments. Butler added that some of the people who Batiste turned away became angry and cursed at Batiste. Even so, Batiste remained calm and "never got tempermental."

10

¶23. Furthermore, it was undisputed that Andreas and Batiste appeared to get along well with each other. According to Butler, they both had said that they enjoyed living together. There was testimony that they were frequently seen together. In her affidavit, Owen said that Andreas and Batiste appeared to be "best buddies." The employees of 21 Apartments had no reason to believe that Batiste would attack Andreas.

¶24. As far as the employees of 21 Apartments knew, Batiste had never been violent with anyone. Instead, Batiste maintained the appearance of a personable, outgoing, friendly, and engaging person. It is unreasonable to hold 21 Apartments to a precognitive duty to warn Andreas that Batiste was a violent person based solely on Batiste's expressed desire to avoid violence. "The actor is not bound to a precision of anticipation [that] would include an unusual and improbable or extraordinary occurrence, although such happening is within the range of possibilities." *Rein*, 865 So. 2d at 1144 (¶32). "[T]he principles of common law must be kept within practical bounds and so as not to occupy an attitude which would place it over and above the heads of those who must carry on the everyday affairs of life." *Id*. As a matter of law, we find that Batiste's resident-concern form did not provide 21 Apartments with actual or constructive knowledge that Batiste was a violent person. It follows that 21 Apartments did not have a duty to warn Andreas that Batiste was a violent person. Having found such, it is unnecessary to determine whether there are genuine issues of material fact regarding the remaining elements of a prima facie case of negligence. Accordingly, there is no merit to this issue.

## II. BACKGROUND CHECK

11

¶25. The Galanises also argue that 21 Apartments had a duty to deny Batiste's application for a lease based on his prior criminal history for credit-card theft.[9] The Galanises reason that if 21 Apartments had followed its policy, Batiste would have never lived with Andreas. They further reason that Batiste would not have stolen from Andreas, Andreas would not have confronted Batiste, and Batiste would not have killed Andreas.

¶26. As discussed previously, Batiste's former attorney contacted 21 Apartments and explained that Batiste had pled guilty to credit-card fraud, but he had not been adjudicated guilty. Batiste's former attorney also sent 21 Apartments a non-adjudication order. A subsequent background check showed that Batiste had not been convicted of any offense.

¶27. It was 21 Apartments' policy to decline an application if the prospective tenant had been convicted of a felony. Although Batiste had pled guilty to credit-card fraud, he had not been adjudicated guilty. Technically, Batiste had not been convicted of a felony, and 21 Apartments did not act contrary to its own policy. Furthermore, it was not foreseeable that because Batiste had pled guilty but not been adjudicated guilty of credit-card fraud, he would kill one of his roommates. There is no merit to this issue.

---

[9] Judge Griffis's dissent notes the Galanises' claim that 21 Apartments also had constructive notice of Batiste's violent nature because an investigative report from Lauderdale County indicated that Batiste had been arrested for simple assault during June 2002. However, Butler stated that the background check "only told [him] that the person did not pass the background check . . . ." In other words, the background check did not produce a comprehensive criminal history. There is no evidence that 21 Apartments had notice that Batiste had been charged with simple assault during June 2002. And there is no evidence that Batiste had been convicted of that charge. In fact, the record indicates that the simple-assault charge had been dismissed.

### III. HEIGHTENED DUTY OF CARE

¶28. Finally, the Galanises argue that because 21 Apartments performed background checks on prospective tenants and helped tenants find potential roommates, 21 Apartments owed Andreas a "heightened" duty of care. To support their argument, the Galanises rely entirely on *Doe ex rel. Doe v. Wright Security Services*, 950 So. 2d 1076 (Miss. Ct. App. 2007). In *Doe*, this Court reversed a circuit court's decision to grant summary judgment in favor of a security service after a student was sexually assaulted by another student while neither student was on school property. *Id*. at 1086 (¶43). We held that summary judgment was inappropriate because the security service had contracted with the victim's school district to provide security services; thus, the security service had accepted the duty to protect the victimized student. *Id*. at 1080 (¶15). We further noted that *Doe* was not a premises-liability case. *Id*. at 1081 (¶18).

¶29. 21 Apartments' policies of performing limited background checks and assisting tenants in finding roommates do not rise to a contractual "heightened" duty of care. 21 Apartments did not guarantee that a tenant would not be harmed by a roommate. Tenants were informed that they were responsible for their own safety. 21 Apartments did not promise to do anything for Andreas beyond what it provided. Furthermore, 21 Apartments merely introduced Andreas and Batiste. 21 Apartments did not force Andreas to live with Batiste. Andreas and Batiste both chose to share an apartment. We find no merit to the Galanises' argument that 21 Apartments owed Andreas a "heightened" duty of care.

¶30. **THE JUDGMENT OF THE OKTIBBEHA COUNTY CIRCUIT COURT IS**

13

**AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING, P.J., ISHEE, CARLTON AND FAIR, JJ., CONCUR. GRIFFIS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY MAXWELL AND JAMES, JJ.; ISHEE, J., JOINS IN PART. MAXWELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GRIFFIS, P.J.; JAMES, J., JOINS IN PART. JAMES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. BARNES, J., NOT PARTICIPATING.**

**GRIFFIS, P.J., DISSENTING:**

¶31. I respectfully dissent.

¶32. In *Daniels v. GNB, Inc.*, 629 So. 2d 595, 599 (Miss. 1993), the supreme court held:

> All motions for summary judgment should be viewed with great skepticism and if the trial court is to err, it is better to err on the side of denying the motion. When doubt exists whether there is a fact issue, the non-moving party gets its benefit. Indeed, the party against whom the summary judgment is sought should be given the benefit of every reasonable doubt.
>
> A motion for summary judgment should be overruled unless the trial court finds, beyond any reasonable doubt, that the plaintiff would be unable to prove any facts to support his claim. If facts are in dispute, it is not the province of the trial court to grant summary judgment thereby supplanting a full trial with its ruling. "Accordingly, the court cannot try issues of fact on a Rule 56 motion; it may only determine whether there are issues to be tried."

(Internal citations omitted). This Court's de novo review of the motion for summary judgment requires that we decide whether there are issues to be tried.

¶33. The majority has determined that "[i]t is unreasonable to hold 21 Apartments to a precognitive duty to warn Andreas that Batiste was a violent person based solely on Batiste's expressed desire to avoid violence." The majority then concludes that "[a]s a matter of law, we find that Batiste's resident-concern form did not provide 21 Apartments with actual or

14

constructive knowledge that Batiste was a violent person. It follows that 21 Apartments did not have a duty to warn Andreas that Batiste was a violent person."

¶34. The circuit court correctly stated the applicable law:

> "The criminal acts of a third party may be deemed reasonably foreseeable if the premises owner had cause to anticipate such acts." *Davis v. Christian Brotherhood Homes of Jackson, Mississippi, Inc.*, 957 So. 2d 390, 402 (¶22) (Miss. Ct. App. 2007). "Cause to anticipate may be imputed to the premises owner by virtue of his (1) actual or constructive knowledge of the third party's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence existed on the premises." *Id.*

I agree with that this is not an "atmosphere of violence" case. Instead, the Galanises survive summary judgment if they can show that there is a genuine issue of a material fact in dispute as to "whether 21 Apartments had actual or constructive knowledge of Batiste's violent nature, prior to Galanis'[s] murder."

¶35. The Galanises argue that there was a genuine issue of a material fact that would establish actual or constructive notice by 21 Apartments. They claim that (a) 21 Apartments knew Batiste had pled guilty to the felony of uttering forgery, (b) an investigative report from Lauderdale County indicates Batiste was arrested for simple assault on June 11, 2002, and (c) Batiste had threatened to "get violent" in the resident concern form he filed against Arthur Hosley. The majority and the circuit court rejected all three arguments. I disagree.

¶36. I begin with the resident concern form. Batiste complained to 21 Apartments about his then-roommate:

> *I can't take it anymore. I don't want to get violent.* He's had to[o] many chances. I wish he would leave now because I can't stay in an environment where ever time I turn around I have a fly in my room. I keep my things clean

15

and my room organized. He doesn't even take out the trash. *I hope this get resolved soon because I really don't want to take matters in my own hands.*

(Emphasis added).

¶37. The circuit court found that "[t]here is nothing in the evidence before this [c]ourt to indicate that Batiste ever acted on this statement." Indeed, if Batiste had acted on this threat, there would be no question that 21 Apartments had a duty to warn future roommates. But such is not the case here. Instead, the question is whether there are any facts in dispute that would allow reasonable minds to conclude whether this statement was sufficient to establish 21 Apartments had actual or constructive knowledge of Batiste's "propensity for violence."

¶38. What did Batiste communicate to 21 Apartments when he said, "I don't want to get violent"? The majority reasons that "it is unreasonable to view Batiste's resident-concern form in a vacuum as though 21 Apartments only had it as a means to determine whether Batiste was a violent person." In fact, I agree with the majority that "[t]his statement is ambiguous in that it is open to multiple interpretations." However, I do not attempt to make the interpretation as to what Batiste meant with the language he used and what 21 Apartments understood when it received this form. Certainly, I cannot accept the majority's and the circuit court's interpretation that Batiste only meant something nonviolent.

¶39. I do not know what Batiste meant when he wrote "I don't want to get violent" or "I really don't want to take matters in my own hands." A reasonable person could conclude that this negative statement also expressed the intent to "get violent."

¶40. For the purpose of summary judgment, the standard of review requires that we review

16

all evidentiary matters in the light most favorable to the nonmoving party and give the nonmoving party the benefit of every reasonable doubt. Applying this standard of review, I cannot accept the "literal" interpretation by the majority and the circuit court. Instead, I find that reasonable minds may interpret this language differently. Thus, the words Batiste chose to use indicate to me that a possible interpretation of "get violent" could be a threat of violence. The interpretations offered by the majority and the circuit court, in my opinion, are mere speculation.

¶41. The Galanises also point to the testimony of Debbie Owen. 21 Apartments offered the affidavit of Owen to support its motion for summary judgment. There, Owen stated, "I had no knowledge whatsoever of anything that would lead me to believe that Bobby Batiste had a violent nature or violent tendencies." As an employee of 21 Apartments, Owen signed and received Batiste's resident concern form on April 17, 2007. She then stated that she did not read the resident concern form when Batiste gave it to her. Instead, she placed it on the desk of her boss, Nandra Jackson.

¶42. At her deposition, Owen testified:

> Q. You didn't really take a look at this until after you had offered your affidavit in this case?
>
> A. I don't remember, actually, when I actually saw it, to be honest.
>
> Q. And again, in your affidavit, you say that, "I had no knowledge whatsoever of anything that would lead me to believe that Bobby Batiste had a violent nature or violent tendencies." Obviously, if you had read this before you did that affidavit, where he clearly states, "I don't want to get violent," that would be in contradiction to what's in your affidavit; correct?

17

A. I didn't read this, though.

Q. Right. Because it's in contradiction to what's in your affidavit.

A. I don't understand what you're saying to me, or what you're asking me.

Q. Well, I guess what I'm saying is this, Debbie: You did an affidavit and said, "I had no knowledge whatsoever of anything that would lead me to believe that Bobby Batiste had a violent nature or violent tendencies."

A. That's correct.

Q. That's correct. And had you read this beforehand -

A. I would have known.

Q. You would have known, and you would not have put that in your affidavit?

Q. Correct?

A. Correct.

¶43. Owen's deposition testimony, in my opinion, indicates that there is a genuine issue of a material fact in dispute as to whether 21 Apartments had actual or constructive knowledge of Batiste's "propensity for violence."

¶44. The Galanises also argue that 21 Apartments had a duty to warn Andreas of Batiste's foreseeable criminal acts. To support this claim, they argue that a landowner owes "an invitee the duty 'to keep the premises reasonably safe and when not reasonably safe to warn only where there is hidden danger or peril that is not in plain and open view.'" *Massey v. Tingle*, 867 So. 2d 235, 239 (¶13) (Miss. 2004) (other citations omitted). These duties are separate duties. *Mayfield v. The Hairbender*, 903 So. 2d 733, 738 (¶20) (Miss. 2005). The

18

breach of either duty will support a negligence claim, and they must be separately analyzed. *Id*.

¶45. The Galanises offer the following facts to support the duty to warn. 21 Apartments first discovered Batiste's criminal history in February 2007, as a result of the background check they were performing for his lease renewal. Once 21 Apartments discovered Batiste's criminal history, it informed Batiste that he could not work for 21 Apartments, that his renewal rental application had been denied, and that his lease would not be renewed. Batiste convinced 21 Apartments to make an exception for him, which would allow him to remain a tenant, despite his criminal history. In July 2007, almost six months later, Batiste's attorney sent a letter along with a copy of a nonadjudicated order for credit-card theft in Kemper County, Mississippi. The Galanises contend that these documents notified 21 Apartments that Batiste had pled guilty to the felony of credit-card theft. Thus, the Galanises argue that 21 Apartments failed to maintain a reasonably safe premises by allowing Batiste to participate in its roommate-matching program with his past criminal history and threats against previous roommates.

¶46. The Galanises also point to evidence of 21 Apartments employees. Owen admitted that it was against 21 Apartments' policy to allow tenants with a criminal history to live at 21 Apartments. Butler also stated that there was a "zero tolerance" policy preventing lease agreements with applicants that had a negative criminal background check. They conclude that 21 Apartments made an exception to the "zero tolerance" policy to allow Batiste to live there; it did not make an exception that would allow Batiste to work for 21 Apartments.

19

Hence, they claim that 21 Apartments was not going to give an admitted credit-card thief an opportunity to steal from 21 Apartments as an employee, but they did not mind giving Batiste an opportunity to steal from an unsuspecting roommate while they collected his rent payments. As a result, the Galanises conclude that "[t]he party in the best position to eliminate a dangerous condition should be burdened with that responsibility." *Tharp v. Bunge Corp.*, 641 So. 2d 20, 25 (Miss. 1994). 21 Apartments was in the best position to eliminate the dangerous condition by simply adhering to its "zero tolerance" policy. It concludes that had 21 Apartments not changed its initial decision not to renew a lease with Batiste, Andreas would not have been placed in a dangerous environment.

¶47. In addition, the Galanises point to 21 Apartments' response when Andreas told 21 Apartments that he had discovered that a significant amount of money was missing from his bank account and that his credit card had been stolen. He told 21 Apartments that he suspected Batiste, and he sought guidance from 21 Apartments. Instead of counseling Andreas that Batiste's criminal history could present a dangerous condition, 21 Apartments said nothing.

¶48. The question for us to decide is whether 21 Apartments has met its burden for purposes of summary judgment. "A duty to warn arises when there is a dangerous condition." *Richardson v. Grand Casinos of Miss., Inc.*, 935 So. 2d 1146, 1149 (¶10) (Miss. Ct. App. 2006). I find that there are genuine issues of a material fact in dispute as to whether 21 Apartments had a duty to warn Andreas of Batiste's criminal history and threats.

¶49. Next, the Galanises argue that 21 Apartments had a heightened self-imposed duty not

20

to allow Batiste to lease with other roommates in the roommate-matching program. 21 Apartments had a duty to provide reasonably safe premises to its tenants. Once 21 Apartments became aware of Batiste's criminal history and/or violent nature, it should not have allowed him to continue residing at the apartment complex. Despite having a "zero tolerance" policy for criminal history, 21 Apartments changed its decision not to renew Batiste's lease, and allowed him to be paired with Andreas in the roommate-matching program.

¶50. When Andreas signed his rental application for 21 Apartments, a portion of the application he completed dealt with the roommate-matching program, which "assign[s] rooms based on the interest, study and living habits" of roommates. As part of the application process, Andreas (and all other tenants or prospective tenants) agreed to a necessary investigation of "credit, character, and reputation," including a criminal background check. 21 Apartments' operation manual states its policy that "conducting a thorough background check prior to accepting an application for residency is critical and is policy." When Andreas consented to the background investigation, he was placed on notice that a criminal history would result in denial of the application. Thus, 21 Apartments implicitly agreed to match Andreas with a roommate that had also passed his criminal background check. Essentially, 21 Apartments contractually agreed to perform the due diligence for Andreas pertaining to properly vetting his "matched" roommates.

¶51. By consenting to participate in the roommate-matching program, Andreas believed that any potential roommate 21 Apartments paired him with would have undergone the same

21

scrutiny. The roommate-vetting service was a duty created and assumed by 21 Apartments. The duty to perform a background check and properly screen tenants was part of the agreement 21 Apartments made to each tenant, not just Andreas. This was a self-imposed and created duty to invitees that is greater than the normal common-law duties owed to invitees. *See Doe v. Wright Sec. Servs.*, 950 So. 2d 1076, 1080 (¶13) (Miss. Ct. App. 2007) (stating that a "duty also exists where a party contracts to undertake or otherwise assumes a duty").

¶52. The Galanises argue that 21 Apartments created a duty that did not otherwise exist by agreeing to run background checks on tenants participating in their roommate-matching program. In so doing, 21 Apartments had a heightened and special duty to provide Andreas with reasonably safe premises on which to live and to warn Andreas of Batiste's history. 21 Apartments breached this heightened duty by allowing Andreas to be "matched" with a known criminal. Pursuant to 21 Apartments' policies, Batiste should not have been allowed to lease from 21 Apartments, and his continued tenancy was in violation of the policy. 21 Apartments' breaches, coupled with its failure to inform Andreas of the information it had about Batiste, were the proximate cause of Andreas's death.

¶53. For these reasons, I respectfully dissent.

**MAXWELL AND JAMES, JJ., JOIN THIS OPINION. ISHEE, J., JOINS THIS OPINION IN PART.**

**MAXWELL, J., DISSENTING:**

¶54. The majority recognizes "[t]his is clearly a premises-liability case." And it also

22

correctly notes "duty is a question of law." Maj. Op. (¶¶14, 18). So I am unsure why it latches onto a ***non***-premises liability case, *Rein v. Benchmark Construction Co.*, 865 So. 2d 1134 (Miss. 2004), to justify its holding that 21 Apartments owed no duty as a matter of law.

¶55. In *Rein*, the question of duty was truly a question—given the quite tenuous relationship between the injured party and the defendant.[10] But here, the duty 21 Apartments owed to its business invitees "is well-settled under Mississippi law." *Karpinsky v. Am. Nat'l Ins.*, 109 So. 3d 84, 89 (¶12) (Miss. 2013). A business owner owes its invitees the duty to keep its premises in a reasonably safe condition. *Id.* And as part of this duty, a business owner must protect its invitees from injuries at the hand of others that are reasonably foreseeable. *Kroger Co. v. Knox*, 98 So. 3d 441, 444 (¶16) (Miss. 2012); *see also Corley v. Evans*, 835 So. 2d 30, 38 (¶22) (Miss. 2003); *Lyle v. Mladinich*, 584 So. 2d 397, 399 (Miss. 1991).

¶56. In determining if a third-party injury is "reasonably foreseeable," trial judges are not without guidance. According to the supreme court, a third-party-inflicted injury is

---

[10] In *Rein*, the question of duty was unsettled, because the facts were so unusual—the family of a nursing-home patient, who died from fire-ant bites, sued the construction company that had built the nursing home two years earlier, claiming a causal link between the home's construction and the fire-ant infestation. *Rein*, 865 So. 2d at 1137 (¶¶3-4). The construction company argued it could not have reasonably foreseen its actions could have somehow led to a patient dying from fire-ant bites, and thus it owed no duty to protect that patient. *Id.* at 1139 (¶13). The supreme court agreed, concluding the construction company "may have reasonably foreseen an insect infestation as a result of improper construction techniques and poor planning of the drainage system[,]" but "could not reasonably foreseen that [a resident] would be attacked and killed by fire ants two years after construction of the [nursing home]." *Id.* at 1146 (¶40).

23

reasonably foreseeable if there is "cause to anticipate the wrongful or negligent act" of that third party. *Corley*, 835 So. 2d at 38 (¶23) (quoting *Grisham v. John Q. Long V.F.W. Post*, 519 So. 2d 413, 416 (Miss. 1988)). This "requisite cause" for anticipating the assault may arise from two types of knowledge— "(1) actual or constructive knowledge of the assailant's violent nature, or (2) actual or constructive knowledge that an atmosphere of violence exists on the premises." *Kroger*, 98 So. 3d at 443 (¶14) (quoting *Lyle*, 584 So. 2d at 399).

¶57. So in this case, the pertinent question of law—Did 21 Apartments owe Andreas a duty to protect him against Batiste?—is answered by precedent. Under Mississippi tort law, 21 Apartments owed Andreas a duty if it had either actual or constructive knowledge of Batiste's violent nature. To prove this duty exists, the Galanises must *factually* prove 21 Apartments had actual or constructive knowledge of Batiste's violent nature. This is all they had to show to trigger 21 Apartments' duty to protect Andreas. *Cf. Karpinsky*, 109 So. 3d at 89 (¶12).

¶58. Since the Galinises were opposing summary judgment, their burden of proof is really best described as a "burden of production." *See id.* at (¶13). What that means is that, to survive summary judgment, the Galanises needed only produce sufficient evidence to establish the essential duty element. *See id.* at (¶17). And I agree with Judge Griffis that the Galanises met their burden of production. *See Brown v. Credit Ctr., Inc.*, 444 So. 2d 358, 362 (Miss. 1983) ("[T]he party against whom the summary judgment has been sought should be given the benefit of every reasonable doubt.").

¶59. The apartment's complaint form showed Batiste had previously documented his anger

24

over a run-in with a past roommate. As Batiste put it, "I can't take it anymore. I don't want to get *violent . . . .* I hope [my personal issues with my roommate] get resolved soon because *I really don't want to take matters into my own hands*." (Emphasis added).

¶60. I do agree with the majority that neither the trial judge nor this court on de novo review may focus solely on the complaint form without considering *all* evidence presented. But Rule 56 requires all evidence be viewed in the light *most favorable to the Galanises. See Karpinsky*, 109 So. 3d at 88 (¶9). And when this form is viewed in the light most favorable to them, I find it is sufficient to show 21 Apartments was either actually or constructively on notice about Batiste's violent nature.

¶61. Because I find the Galineses met their burden of production on the duty element, I would reverse the grant of summary judgment and remand this case for further proceedings.

**GRIFFIS, P.J., JOINS THIS OPINION. JAMES, J., JOINS THIS OPINION IN PART.**